[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 3, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-15932

_____

D.C. Docket No. 07-00402-CV-1-SPM-WCS

FLORIDA STATE CONFERENCE OF THE NATIONAL
ASSOCIATION FOR THE ADVANCEMENT OF COLORED
PEOPLE (NAACP), AS AN ORGANIZATION AND REPRESENTATIVE OF
ITS MEMBERS, HAITIAN AMERICAN GRASSROOTS COALITION,
AS AN ORGANIZATION AND AND REPRESENTATIVE OF ITS
MEMBERS, SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT,
AS AN ORGANIZATION AND REPRESENTATIVE OF ITS CLIENTS,

Plaintiffs-Appellees,

versus

KURT S. BROWNING,
IN HIS OFFICIAL CAPACITY AS SECRETARY
OF STATE FOR THE STATE OF FLORIDA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(April 3, 2008)**

Before TJOFLAT, DUBINA and BARKETT, Circuit Judges.

TJOFLAT, Circuit Judge:

This is an appeal of a preliminary injunction barring enforcement of a Florida voter registration statute as being preempted by two different federal statutes. The state law would require as a precondition of registering to vote for the first time in Florida that the voter disclose her driver's license number or the last four digits of her Social Security number on the registration application, and that this number match up with the number for this voter contained in the state driver's license database or the Social Security Administration's database, respectively. The district court held that plaintiffs, several organizations representing the interests of minority communities in Florida, had standing to challenge the statute, would likely succeed at trial on the merits of their claim that federal law preempts the enforcement of the state law, and would suffer irreparable injury absent provisional relief. Accordingly, the court preliminarily enjoined the enforcement of the state statute. We affirm the district court's decision on plaintiffs' standing to prosecute this action and reverse its decision granting the preliminary injunction.

I.

In the wake of the November 2000 presidential election and its attendant controversies, Congress undertook to review and reform the administration of

2

federal elections. This legislative effort resulted in the Help America Vote Act of 2002, Pub. L. 107-252, 116 Stat. 1706 (codified at 42 U.S.C. § 15301 et seq.) ("HAVA"). Title III of HAVA, pertinent to this appeal, imposes a set of requirements upon the states in the areas of voter registration and election administration. The Act charges the states to implement its array of directives. See 42 U.S.C. § 15485. One such provision mandates that each state create a centralized, periodically updated database for its registration rolls, and that each registered voter must be linked to a unique identification number in this database. See 42 U.S.C. § 15483(a). Voters are required to provide on their registration application forms either the last four digits of their Social Security numbers or their driver's license numbers; if a voter has been issued neither number, then the state is required to assign to that voter a unique identification number for entry into the database. See id. at § 15483(a)(5)(A). HAVA also directs each state to determine according to its own laws whether the information provided by the registrant "is sufficient to meet the [federal] requirements." Id. at § 15483(a)(5)(A)(iii).

The state statute challenged in this case, Florida Statutes § 97.053(6) ("Subsection 6"), was enacted by the Florida legislature in 2005 and became effective on January 1, 2006, as part of Florida's implementation of HAVA. As amended, Subsection 6 imposes a new verification process as a precondition of

3

voter registration for first-time registrants in Florida. See Fla. Stat. § 97.053(6).

Under Florida law, valid registration is a prerequisite to voting in elections. See

Fla. Const. art. VI, § 2 ("Every citizen of the United States who is at least eighteen

years of age and who is a permanent resident of the state, if registered as provided

by law, shall be an elector of the county where registered."); Fla. Stat. § 97.053(2)

("If the applicant fails to complete his or her voter registration application . . . such

applicant shall not be eligible to vote in that election."). To be eligible to register

to vote, a person must be a citizen of the United States, a permanent resident of

Florida, over the age of eighteen, and not have been convicted of a felony or

adjudicated mentally incapacitated. See Fla. Stat. § 97.041. Florida law also

requires the voter to file her registration application at least twenty-nine days

before a scheduled election, the so-called book closing date, in order to be eligible

to vote in that election. See Fla. Stat. § 97.053(3)-(4); § 97.055.

To complete a registration form, the applicant must disclose certain personal

identifying information, including the applicant's name, home address, and date of

birth. Additionally, both Subsection 6 and HAVA require each applicant to

provide either her Florida driver's license (or state-issued non-driver identification)

number or the last four digits of the applicant's Social Security number when

4

registering to vote.[1]  Subsection 6 also requires that before an application is accepted and the voter is listed as registered, the Florida Department of State must first verify or match the number provided in the application with the number assigned to the applicant's name by the state Department of Highway Safety and Motor Vehicles ("DHSMV") or the Social Security Administration ("SSA").

The consequences of the matching procedure are at the center of this controversy.  After a voter completes the registration application form and turns it in to the county election officials, the Department of State takes the information on the application form and compares it electronically against the information contained in the DHSMV and SSA databases.[2]  If the information the applicant

[1] Those who affirm that they have neither a Social Security number nor a Florida driver's or identification number are not required to fill out that portion of the application but instead must provide a copy of an identifying document from a pre-approved list.

[2] Both state and federal agencies participate in the matching process.  If the applicant supplied a Florida identification number (driver's license or non-driver identification issued by the DHSMV), the DHSMV will first attempt an automatic electronic match by comparing the identification number and the name of the applicant against the number and name in the DHSMV's database.  The result will either be a match, nonmatch, or possible match.  Possible matches are then reviewed by the Florida Bureau of Voter Registration Services within the Department of State, which will manually check the individual possible matches against the entries in the same DHSMV database.  Nonmatches are returned to the Supervisor of Elections in each county for further review.
        If the applicant supplied the last four digits of her Social Security number instead, her application information is forwarded to the SSA for verification.  The SSA protocol compares the applicant's Social Security number, first name, last name, and year and month of birth against the records in its database.  All four elements have to match exactly with at least one entry for a living person in the SSA database to be considered a "match" by Florida.  Entries that match only with deceased persons in the SSA database are further reviewed by the Bureau of Voter Registration Services, and all nonmatches are reviewed by the county Supervisors of Elections.

fills out on her registration form cannot be matched to the information held by the DHSMV or the SSA, the registration will not be completed and the applicant will receive a brief and generic notification through the mail to that effect.[3]

What the voter must do to correct the mistake depends on the nature of the error, which unfortunately is not always made known to the applicant before she goes to correct it. If an error was made by the Department of State, e.g., during the data entry or matching process someone transposes two digits of a driver's license number, then the applicant needs to present documentary proof, like a copy of her driver's license or Social Security card, to the county Supervisor of Elections showing that the identification information she submitted in her application was correct. The voter can do this either before election day, or she can go to the polls on election day and cast a provisional ballot and then within two days bring the proof to the Supervisor of Elections. See Fla. Stat. § 97.053(6); § 101.048 (specifying the procedure for validating a provisional ballot).

However, if the error was made by the applicant herself – either by transposing digits in the entry of the driver's license number or by entering a

---

[3] Florida law requires officials to enter the information received from applicants within thirteen days of receiving the application. Fla. Stat. § 97.053(7). State law also provides that election officials must notify applicants within five business days of any failure to provide the necessary and correct information on the registration application. Fla. Stat. § 97.052(6). Thus, from the date the election officials receive the application, they have up to a maximum of eighteen days to notify the applicant of any error or omission – including a mismatch of the identification numbers – on the application.

6

nickname or maiden name instead of the precise spelling of her legal name – then the only way to cure the defect and be eligible to vote in the upcoming election is by filing a new application with the correct information <u>before the book closing date</u>.[4] <u>See</u> Fla. Stat. § 97.052(6) (an applicant can correct any missing information on the registration form "up until the book closing [date] for [the] next election"); § 97.053(6) (a provisional ballot will be counted only if the applicant can verify the authenticity of the identification numbers "provided on the application"). There is no post-election way to fix an applicant-side error, and the provisional ballot cast by such a voter would not be counted because the voter would have failed to register in time. <u>See</u> Fla. Stat. § 101.048(2)(b)2 ("If it is determined that the person voting the provisional ballot was not registered . . . then the provisional ballot shall not be counted . . . .").[5]

## II.

Plaintiffs are the Florida State Conference of the National Association for the Advancement of Colored People ("Florida NAACP"), the Southwest Voter

---

[4] This rule has the practical effect of moving back the date before each election by which voters must register, which is currently set at twenty-nine days before the election. <u>See</u> Fla. Stat. § 97.055. Since there is always a risk of making a mistake on the form, applicants must know to file the application early enough so that they can be notified of a mismatch and refile the application before the book closing date.

[5] It goes without saying that this court's interpretation of Subsection 6 for the purposes of this challenge, including but not limited to the post-election curability of applicant-side errors, is subject to different, authoritative interpretations by the Florida state courts.

Registration Education Project ("SVREP"), and the Haitian-American Grassroots Coalition ("HAGC"). All three plaintiff organizations work, among other goals, to increase voter registration and participation among members of racial and ethnic minority communities in Florida. The Florida NAACP and the HAGC are both umbrella organizations with local chapters throughout the state and have approximately 13,000 and 700 members statewide, respectively. SVREP is not a membership organization and has no members in Florida.

Plaintiffs filed this suit in the United States District Court for the Northern District of Florida and simultaneously moved for a preliminary injunction against the Florida Secretary of State, seeking to block the enforcement of Subsection 6 prior to the book closing date for the primary election held on January 29, 2008. The amended complaint raises a host of claims for relief under 42 U.S.C. § 1983, alleging that Subsection 6 violates the fundamental right to vote contained in the First and Fourteenth Amendments, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment. It also raises statutory claims, alleging that Subsection 6 conflicts with and is preempted by the follwing: section 303 of HAVA, 42 U.S.C. § 15483; section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973; Title I of the Civil Rights Act of 1964, 42 U.S.C. § 1971(a)(2)(B); and the National Voter Registration Act, 42 U.S.C. §

8

1973gg-6.

The Secretary opposed the preliminary injunction and also moved to dismiss all of the counts in the amended complaint for failing to state claims upon which relief can be granted and for failing to establish that plaintiffs have standing under Article III of the Constitution to seek relief.

After expedited discovery, the district court held that plaintiffs have Article III standing in three different capacities. First, plaintiffs have standing to sue on their own behalf as organizations whose missions would be impeded and whose resources would be diverted as a direct result of the enforcement of Subsection 6. Second, the Florida NAACP and the HAGC also have standing as representatives of their members who are otherwise eligible voters but nonetheless face an imminent threat of being disenfranchised by enforcement of Subsection 6.[6] Third, the court held that plaintiffs also have third-party standing to sue on behalf of nonmember eligible voters in Florida who would be denied registration and hence the vote under Subsection 6.[7]

In a separate order and opinion, the district court granted plaintiffs' motion

---

[6] Plaintiff SVREP acknowledges that it does not have associational standing because it is not a membership organization.

[7] As we are satisfied that plaintiffs have met Article III's standing requirements under the alternative theories actually litigated – as representatives of their members and as organizations directly injured – we pretermit consideration of the issue of whether plaintiffs have standing to litigate the claims of nonmembers in a representative capacity.

9

for preliminary injunction. It found that plaintiffs are likely to succeed on the merits of their conflict preemption claims under HAVA and Title I of the Civil Rights Act of 1964, 42 U.S.C. § 1971, and that without a provisional remedy the plaintiffs would likely suffer irreparable harm once the book closing date passed.

Because the statutory claims under HAVA and § 1971 were sufficient to grant plaintiffs' motion, the court avoided deciding whether the constitutional challenges were likely to succeed on the merits. However, the court held that plaintiffs' factual allegations were sufficient to state constitutional claims for relief and thus denied the Secretary's motion to dismiss those claims. On plaintiffs' remaining two statutory claims – under Section 2 of the Voting Rights Act and under the National Voter Registration Act – the court granted the Secretary's motion to dismiss. The Secretary now appeals the district court's decision on standing and its order granting the preliminary injunction.[8]

III.

We first review whether any plaintiff has standing under Article III to invoke the jurisdiction of the federal courts to "decide the merits of the dispute or of particular issues." Nat'l Alliance for the Mentally Ill, St. John's Inc. v. Bd. of

---

[8] The district court did not assess the likelihood of plaintiffs' success on the merits in their constitutional challenges, and neither side on appeal has briefed the constitutional merits issues. These issues are therefore not before us.

10

County Comm'rs, 376 F.3d 1292, 1294 (11th Cir. 2004) (quoting Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975)). This limitation follows from Article III's grant of judicial power to the federal courts to decide only "cases" and "controversies." See Allen v. Wright, 468 U.S. 737, 750, 104 S. Ct. 3315, 3324, 82 L. Ed. 2d 556 (1984). The constitutionally minimum requirements for standing are three-fold. First, the plaintiff must have suffered, or must face an imminent and not merely hypothetical prospect of suffering, an invasion of a legally protected interest resulting in a "concrete and particularized" injury. Second, the injury must have been caused by the defendant's complained-of actions. Third, the plaintiff's injury or threat of injury must likely be redressible by a favorable court decision. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992). The standing dispute in this case is entirely over the first factor, the demonstration of injury in fact.[9] Plaintiffs argued below and presently maintain that they have demonstrated the

_____

[9] Although the Secretary on appeal does not question the other two factors affecting standing, causation and redressibility, we review nostra sponte whether they are satisfied in this case and conclude that they are. If we accept the injury to be that Subsection 6 will hinder the organizations' ability to carry out their mission of registering eligible voters by forcing plaintiffs to divert time and resources needed to comply with the matching requirement, causation is apparent. An injunction against the enforcement of Subsection 6 would also redress this injury by doing away with the matching requirement, thereby freeing up the organizations to get on with their business. Because these two requirements of standing on plaintiffs' own behalf are met, we need not consider whether plaintiffs would also meet these two standing requirements under the associational or third-party theories.

11

imminent threat of injury both to their members and to themselves.

A.

1.

An organization has standing to enforce the rights of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181, 120 S. Ct. 693, 704, 145 L. Ed. 2d 610 (2000) (citing Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441, 53 L. Ed. 2d 383 (1977)); see also Doe v. Stincer, 175 F.3d 879, 882 (11th Cir. 1999). The Secretary does not challenge the germaneness prong of this inquiry, and we find that the interests of voters in being able to register are clearly germane to plaintiffs' purposes. The Secretary likewise does not contest the third prong, and we are mindful that when the relief sought is injunctive, individual participation of the organization's members is "not normally necessary." United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 546, 116 S. Ct. 1529, 1531, 134 L. Ed. 2d 758 (1996). The nub is whether the members themselves would have standing.

12

The Secretary argues that because plaintiffs have not identified any specific members who have had their registration denied due to a typographical or clerical error, the members and therefore plaintiffs lack associational standing. Plaintiffs respond that this information is understandably unavailable because they seek to prevent future harm to the large number of individuals likely to register in the upcoming elections in November 2008, among whom, plaintiffs contend, are likely to be members of their organizations.

In lawsuits seeking a remedy for past violations of an organization's members' rights, it makes sense that, after some discovery, the plaintiff be required to list at least one member who has been injured. But see Stincer, 175 F.3d at 884 ("[U]nder Article III's established doctrines of representational standing, we have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought . . . ."). The cases cited by the Secretary tend to support this proposition concerning past harms, but they do not necessarily extend the requirement of presenting specific injured members to claims of future harms. Anderson v. City of Alpharetta, 770 F.2d 1575 (11th Cir. 1985) (per curiam), affirmed the district court's holding that the NAACP lacked associational standing to assert the constitutional claims of its members because the organization had not been able to identify any member who had been prevented

13

by the city's putatively unconstitutional actions from living in public housing in Alpharetta. Id. at 1582-83. Likewise, National Alliance for the Mentally Ill, St. Johns Inc. v. Board of County Commissioners of St. John's County, 376 F. 3d 1292 (11th Cir. 2004), also involved claims based on injuries allegedly caused by the defendant's past violations. Id. at 1295. It is not surprising then that we affirmed dismissals in these cases for lack of standing because the organizational plaintiffs could not name specific members who have already been injured, as this inability to do so strongly supported the inference that no members were in fact injured.

The situation before us is different. When the alleged harm is prospective, we have not required that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future. The Supreme Court has accepted imminent harm as satisfying the injury-in-fact requirement of Article III standing. In Babbit v. United Farm Workers National Union, 442 U.S. 289, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979), the Court stated that although a plaintiff must establish "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," id. at 298, 99 S. Ct. at 2308, he "does not have to await the consummation of threatened injury to obtain preventive relief." Id. (quoting Ry. Mail Ass'n v. Corsi, 326 U.S. 88, 93, 65 S. Ct. 1483, 1487, 89 L.

14

Ed. 2072 (1945)); 31 Foster Children v. Bush, 329 F.3d 1255, 1265 (11th Cir. 2003). "Imminence" as a doctrinal standard is "somewhat elastic," Lujan, 504 U.S. at 564 n.2, 112 S. Ct. at 2138 n.2, and applying it is not an exercise in conceptual analysis but an attempt to advance the purposes behind the case-or-controversy requirement of Article III, including the guaranty of actual adversity between the parties, the limitation on the power of federal courts, see Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1223 (11th Cir. 2004), and the reservation of judicial resources to resolve more concrete and pressing disputes, see Bowen v. First Family Fin. Servs., Inc., 233 F.3d 1331, 1340 (11th Cir. 2000).

An imminent injury is one that is "likely to occur immediately." 31 Foster Children, 329 F.3d at 1265. The alleged injury in this case, denial of voter registration and hence the right to have one's vote counted, will occur if at all before the scheduled elections in November 2008. Plaintiffs have averred that they intend to increase voter registration efforts and anticipate increased registration applications ahead of the upcoming presidential election. This is sufficient to meet the immediacy requirement and distinguishes this case from the scenario in Elend v. Basham, 471 F.3d 1199 (11th Cir. 2006). In Elend, the plaintiffs sought an injunction against the United States Secret Service to prevent the latter from restricting plaintiffs to sequestered "First Amendment zones" during future protests

15

against President Bush. 471 F.3d at 1203. We upheld the dismissal for lack of standing because the plaintiffs failed to allege when, where, and how such protests were going to occur in the future. Id. at 1206-07. Given that judicial review of so-called time, place, and manner restrictions under the First Amendment are highly context-sensitive, see Clark v. Cmty for Creative Non-Violence, 468 U.S. 288, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984), it was proper to find that there was at that time no justiciable case or controversy. In contrast, plaintiffs here have alleged when and in what manner the alleged injuries are likely going to occur. Immediacy requires only that the anticipated injury occur with some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 211-12, 115 S. Ct. 2097, 2105, 132 L. Ed. 2d 158 (1995).

The requirement of immediacy is satisfied; substantial likelihood of future injury poses a different question. To be likely enough, the threatened future injury must pose a "realistic danger" and cannot be merely hypothetical or conjectural. How likely is enough is necessarily a qualitative judgment, see Wilderness Soc'y v. Alcock, 83 F.3d 386, 390 (11th Cir. 1996), and courts should look for guidance from precedent in the analogical style of the common law tradition, see Allen v.

16

Wright, 468 U.S. 737, 751-52, 104 S. Ct. 3315, 3324-25, 82 L. Ed. 2d 556 (1984).

The line of cases including and following City of Los Angeles v. Lyons, 461 U.S.

95, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983), provides some guideposts on factors

that are relevant to this assessment. In Lyons, the Supreme Court held that the

plaintiff lacked standing to seek prospective injunctive relief against the City of

Los Angeles to prevent the City's police from applying a kind of choke hold on

suspects absent a threat that the suspect would use deadly force to resist arrest.

Lyons, 461 U.S. at 105, 103 S. Ct. at 1667.[10] Lyons alleged that the City

authorized the police's use of choke holds in violation of, among other

constitutional provisions, the Due Process Clause of the Fourteenth Amendment,

but the Court surmised that this policy even if present was not enough to establish

a likelihood of future injury to Lyons. Id. at 106, 103 S. Ct. at 1667.

Several factors appear to undergird the Court's denial of standing in Lyons.

First, the Court noted that for the threatened injury to occur, a sequence of

individually improbable events would have to occur: (1) Lyons would have to do

something to cause another run-in with the Los Angeles police; (2) the city would

---

[10] Although Lyons himself had been subject to such a choke hold on a prior encounter with the police, the Court, following its earlier decision in O'Shea v. Littleton, 414 U.S. 488, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974), emphasized that "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." Lyons, 461 U.S. at 103, 103 S. Ct. at 1666.

have to have authorized all police officers to use choke holds unnecessarily; (3) the police officers in that specific encounter would have to use a choke hold; and (4) the use in that situation would have to have been unnecessary. See id. at 105-06, 93 S. Ct. at 1667. Each event's occurrence was spatially and temporally indeterminate, as opposed to being fixed to either occur or not occur at some time and place. This open-endedness and the number of independent events needed to bring about the alleged injury combined to cast the injury into the realm of conjecture and speculation. See id. at 108, 93 S. Ct. at 1668.

Second, the threatened injury in Lyons was predicated on the plaintiff first doing something that at least would give an officer probable cause to detain or arrest him. The Court voiced its hesitance to assume that the plaintiff will routinely violate the law in the future and thus be brought within arms' reach of the police. See id. at 103, 93 S. Ct. at 1665. Third, there was an adequate remedy at law for the threatened injury in Lyons, namely a damages suit against the City and police should an officer unconstitutionally choke the plaintiff at some future point. Id. at 111, 93 S. Ct. at 1670.

Unpacking the Court's basis for denying standing in Lyons reveals that there is no per se rule denying standing to prevent probabilistic injuries. Indeed, since Lyons we have repeatedly upheld plaintiffs' standing when the alleged injury was

18

prospective and probabilistic in nature. A year after Lyons was decided, we held

that a mentally ill person who was not at the time in state custody had standing to

challenge the constitutionality of an Alabama state practice of placing persons in

county jails pending involuntary commitment proceedings. See Lynch v. Baxley,

744 F.2d 1452, 1457 (11th Cir. 1984). Observing co-plaintiff Pearcy's history of

treatable but recurrent psychopathology, we noted that "there is every likelihood

that any [commitment] petition filed against Pearcy would result in his

incarceration in [county] jail." Id. Ordinarily, a civil commitment petition would

not land one in jail. But given the lack of mental health facilities in some counties,

"it is highly likely that state officials will continue to employ the county jails to

detain" the named plaintiffs and others. Id. The Lynch panel distinguished cases

like Lyons on the basis that Pearcy and others like him could not exercise any form

of conscious control over the likelihood of the threatened injury occurring. Id. at

1457 n.7; see also 31 Foster Children, 329 F.3d at 1266-67 (affirming standing of

foster children to sue to enjoin future violations of substantive due process based

on probability of children suffering future harm while in foster homes); Church v.

City of Huntsville, 30 F.3d 1332, 1339 (11th Cir. 1994) (distinguishing Lyons and

affirming standing of homeless persons to sue for injunctive relief to prevent city

from authorizing police harassment and arrest of homeless persons without cause).

19

In sum, probabilistic harm is "enough injury in fact to confer . . . standing in the undemanding Article III sense." Tenn. Valley Auth. v. U.S. Envtl. Protection Agency, 278 F.3d 1184, 1207 (11th Cir. 2002) (quoting N. Shore Gas Co. v. Envtl. Protection Agency, 930 F.2d 1239, 1242 (7th Cir. 1991) (internal quotation marks omitted)).

Plaintiffs present two kinds of probabilistic injuries to their members. First, they claim that Subsection 6 illegally prevents voters whose registration applications fail to match, due to an error made either by them or by the state, from casting a regular ballot. Second, they claim that Subsection 6 illegally prevents voters whose applications fail to match due to their own mistake from casting a provisional ballot that ultimately gets counted.[11] The likelihood that any given individual will eventually be injured depends on the likelihood that an error of some kind will cause a mismatch. It is not entirely clear from the record what the relevant error rate is in Florida's matching process. However, even using the numbers cited in the Secretary's brief, we arrive at a rejection rate of about one percent.[12] Applying this one percent rate going forward, the odds that any given

_____

[11] Subsection 6 already provides that a voter can cast a provisional ballot and correct a mismatch if the mismatch was caused by a mistake by the Department; however, under state law if the mistake was on the application itself, no cure after the election date is possible.

[12] Data gathered between January 1, 2006, the effective date of Subsection 6, and September 30, 2007, show that there were 14,326 applications rejected for mismatches out of a total of 1,529,465 registration applications.

20

application will be rejected because of a mismatch is also one percent.

To satisfy the requirements of associational standing, all that plaintiffs need to establish is that at least one member faces a realistic danger of having his or her application rejected due to a mistaken mismatch. Given that the NAACP and SVREP collectively claim around 20,000 members state-wide, it is highly unlikely – even with only a one percent chance of rejection for any given individual – that not a single member will have his or her application rejected due to a mismatch.[13] Unlike the alleged threat of injury in <u>Lyons</u>, the "odds" of an injury occurring in this case does not depend on conjecture about how individuals will intentionally act in the future. Rather, the injuries are foreseeable and the expected results of unconscious and largely unavoidable human errors in transcription. Moreover, unlike in <u>Lyons</u>, the chain of events leading to the eventual injury does not begin with an assumption that someone will commit an illegal act; the chain begins when people try to register to vote.

Human fallibility being what it is, someone is certain to get injured in the

---

[13] Based on Florida voter registration data, about one percent of the total number of registration applications through September 2007 were rejected due to a mismatch. The same data reveal that the rate of rejection among African-Americans and Latinos was two percent. If there are even 200 individuals among the 20,000 members of the Florida NAACP and SVREP who are first-time registrants and thus subject to Subsection 6's matching requirement, the probability that not even a single one will be rejected through the matching process is only thirteen percent, if we use the one-percent error rate. If we apply the two-percent rate of rejection for African-Americans and Latinos, the likelihood that at least one person out of 200 will fail to match increases to over ninety-eight percent.

end.  By their nature, the kinds of mechanical, typographical mistakes that plaintiffs claim will illegally disenfranchise voters under Subsection 6 cannot be identified in advance.  Cf. Sandusky County Democratic Party v. Blackwell, 387 F.3d 565, 574 (6th Cir. 2004).  We are thus faced with the choice of deciding this case on the merits now or waiting until thousands (if not more) of registrations are actually rejected just weeks before the scheduled presidential election in November 2008.  This question of timing turns not on standing but on the related jurisdictional doctrine of ripeness.  See Wilderness Soc'y, 83 F.3d at 390.

2.

Two considerations predominate the ripeness analysis: (1) "the hardship to the parties of withholding court consideration" and (2) "the fitness of the issues for judicial decision."  Ala. Power Co. v. U. S. Dep't of Energy, 307 F.3d 1300, 1310 (11th Cir. 2002) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149, 87 S. Ct. 1507, 1515, 18 L. Ed. 2d 681 (1967)).  Both considerations weigh decidedly in favor of reaching the merits of this appeal sooner rather than later.  The Supreme Court has long since held that where the enforcement of a statute is certain, a preenforcement challenge will not be rejected on ripeness grounds.  See Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 143, 95 S. Ct. 335, 358, 42 L. Ed. 2d 320 (1974).  Since enforcement of Subsection 6 is automatic for all new voter

22

registrants, there is no doubt that the statute will be enforced against some of plaintiffs' members. The hardship to would-be voters is that if we require them to wait until after their applications have been rejected to challenge Subsection 6, there may not be enough time to reach a decision on the merits before the actual election.

Waiting until rejections flow in en masse also imposes hardships on the Secretary. If a court enjoins enforcement of Subsection 6 weeks or days before the November election, it may be severely burdensome for the state to reconstitute its registration lists in time. Worse yet, waiting might call into question the status of provisional ballots already cast by voters whose information failed to match because of a mistake on the application form itself, an error incurable under Subsection 6 but potentially trumped by federal law. Judicial involvement in vote-counting invariably invites ugly consequences with which Florida in particular is so painfully familiar.

As for the second factor, the claims on appeal are fit for adjudication because they are predominantly legal questions and the conflict preemption analysis does not require much factual development. See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201-03, 103 S. Ct. 1713, 1720-22, 75 L. Ed. 2d 752 (1983). Subsection 6 is a straightforward statute,

23

so we are not in a worse position for a lack of a state court construction of it. See id. We conclude that plaintiffs have standing to sue on behalf of their members.

B.

On their own behalf, plaintiffs contend that Subsection 6 will hinder their abilities to carry out their missions of registering voters in their respective communities. Specifically, plaintiffs argue that they will have to divert scarce time and resources from registering additional voters to helping applicants correct the anticipated myriad of false mismatches due to errors either by the Department of State or by the applicant. Moreover, they claim that Subsection 6 will decrease electoral participation in these communities by making it more difficult for eligible individuals to register to vote and thereby undermine the organizations' goals. These injuries are different in kind from the alleged injuries to the organizations' members, although both are traceable to the enforcement of Subsection 6.

In response, the Secretary makes two arguments. First, he contends that an assertion that Subsection 6 will impede voter registration efforts is not sufficiently concrete and particularized to meet Article III's requirement of injury in fact. Second, he asserts that even if plaintiffs can demonstrate that it will shift resources away from new registrations to correct mismatches on prior applications, this shift will be an entirely self-inflicted injury. In support of his position, the Secretary

24

relies principally on a recent district court opinion in <u>Common Cause/Georgia v. Billups</u>, 504 F. Supp. 2d 1333 (N.D. Ga. 2007), which held that organizations dedicated to registering voters do not have standing in their own right to challenge a voter ID law. <u>Id.</u> at 1372-73. The opinion in <u>Billups</u>, in turn, relies heavily on a district court opinion in <u>Indiana Democratic Party v. Rokita</u>, 458 F. Supp. 2d 775 (S.D. Ind. 2006), <u>aff'd sub nom.</u> <u>Crawford v. Marion County Election Bd.</u>, 472 F.3d 949 (7th Cir.), <u>cert. granted</u> 128 S. Ct. 34, 168 L. Ed. 2d 809 (2007).

The <u>Rokita</u> court held that organizations cannot establish injury in fact through "imprecise and speculative claims concerning potential future actions" designed to compensate for the effects of the statute. 458 F. Supp. 2d at 816. Any resources that the organizations do end up expending would, moreover, be based on that organization's "sole and voluntary discretion." <u>Id.</u> Although the Seventh Circuit affirmed the merits holding in <u>Rokita</u>, it expressly held that an organization suffers an injury in fact when a statute "compel[s]" it to divert more resources to accomplishing its goals. <u>Crawford</u>, 472 F.3d at 951. Moreover, the court held that "[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." <u>Id.</u> (citing <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180-84, 120 S. Ct. 693, 704-06, 145 L. Ed. 2d 610 (2000)).

25

In reaching its decision on standing, the Crawford court followed a line of cases beginning with Havens Realty Corp. v. Coleman, 455 U.S. 363, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982). Havens held that an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.[14] Id. at 379, 102 S. Ct. at 1124-25; see also Haitian Refugee Center, Inc. v. Nelson, 872 F.2d 1555, 1561 n.10 (11th Cir. 1989). These injuries, the Court determined, were sufficiently concrete to be more than the "abstract social interests" not cognizable as injuries under Article III. See Havens, 455 U.S. at 379, 102 S. Ct. at 1124.

Plaintiffs have made a sufficient showing that they will suffer a concrete injury under Subsection 6. The organizations reasonably anticipate that they will have to divert personnel and time to educating volunteers and voters on compliance with Subsection 6 and to resolving the problem of voters left off the registration rolls on election day. These resources would otherwise be spent on registration drives and election-day education and monitoring. SVREP anticipates that it will

---

[14] The precise issue in Havens was whether the organizational plaintiff had statutory standing to sue under section 812 of the Fair Housing Act of 1968, 42 U.S.C. § 3612. However, the Court noted that because section 812 had been interpreted to "extend to the full limits of Art. III," the inquiry into statutory standing collapsed into the question of whether the injuries alleged met the Article III minimum of injury in fact. Havens, 455 U.S. at 372, 102 S. Ct. at 1121.

expend many more hours than it otherwise would have conducting follow-up work with registration applicants because voters will have their applications denied due to matching failures. In HAGC's case, compensating for the new obstacles created by Subsection 6 would divert substantial resources away from helping voters who may need language-translation assistance on election day. The Florida NAACP plans to register ten percent of the African-Americans eligible to vote in the upcoming election, and personnel that would otherwise be part of this registration effort would have to be diverted to resolving mismatches under Subsection 6. Instead of "abstract social interests," the plaintiffs have averred that their actual ability to conduct specific projects during a specific period of time will be frustrated by Subsection 6's enforcement. Even though the injuries are anticipated rather than completed events, they satisfy the immediacy and likelihood requirements for the same reasons as discussed in Section III.A, supra, and for those reasons, the Secretary's argument that the organizational injuries are not concrete or particularized fails.

The Secretary's second argument, that any diversion of resources in response to Subsection 6 is voluntary and hence not an injury, also fails to persuade. The Secretary attempts to draw a distinction between an act or law negating the efforts of an organization, which is admittedly an injury under

27

Havens, and an act or law merely causing the organization to voluntarily divert resources in response to the law, which he claims is not an injury cognizable under Article III.  This distinction finds no support in the law, and it misses the point.  For the proposition that "voluntary" diversion of resources are not injuries, the district court in Billups cited an opinion from the Court of Appeals for the District of Columbia Circuit stating that costs of using individual "testers" to ferret out racial discrimination in employment cases cannot count toward the injury in fact requirement.  See Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276-77 (D.C. Cir. 1994).  But this simply says that plaintiffs cannot bootstrap the cost of detecting and challenging illegal practices into injury for standing purposes.  Costs unrelated to the legal challenge are different and do qualify as an injury, whether they are voluntarily incurred or not.  The court expressly held that when a drain on an organization's resources arises from "the organization's need to 'counteract' the defendants' assertedly illegal practices," that drain is "simply another manifestation" of the injury to the organization's noneconomic goals.  Id. at 1277.

In this case, the diversion of personnel and time to help voters resolve matching problems effectively counteracts what would otherwise be Subsection 6's negation of the organizations' efforts to register voters.  The net effect is that the

28

average cost of registering each voter increases, and because plaintiffs cannot bring to bear limitless resources, their noneconomic goals will suffer. Therefore, plaintiffs presently have standing on their own behalf to seek relief.

IV.

We turn now to the merits of the appeal. Preliminary injunctions are reviewed for abuse of discretion, but the legal conclusions underpinning them are still subject to de novo review. See E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc., 756 F.2d 1525, 1529 (11th Cir. 1985). Because we conclude that the federal statutes do not conflict with and preempt Subsection 6, and therefore that plaintiffs are unlikely to prevail on the merits of these claims at trial, we need not discuss the other factors of the preliminary injunction analysis.[15] This Part addresses preemption under HAVA; Part V discusses § 1971 of the Civil Rights Act of 1964.

Where the two conflict, federal law trumps state law; that was always clear. See U.S. Const. art. VI, cl. 2; Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 210-11, 6 L. Ed. 23 (1824). What constitutes a conflict is often less clear. The well-worn taxonomy of preemption doctrine identifies three categories: (1) express

_____

[15] The other factors include whether the plaintiffs will likely suffer irreparable injury absent an injunction, whether the threatened injury to the plaintiffs outweighs the harm the defendant suffers complying with the injunction, and whether the injunction would be adverse to the public interest. See Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004).

preemption; (2) field preemption; and (3) conflict preemption.  See  Gade v. Nat'l

Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98, 112 S. Ct. 2374, 2383, 120 L.Ed.2d

73 (1992) (O'Connor, J., concurring); Pharm. Research and Mfrs. of Am. v.

Meadows, 304 F.3d 1197, 1205 (11th Cir. 2002).  Express preemption occurs when

Congress manifests its intent to displace a state law using the text of a federal

statute.  See Meadows, 304 F.3d at 1205.  Field and conflict preemption in turn

have been considered under the umbrella term "implied preemption."  See Glade,

505 U.S. at 98, 112 S. Ct. at 2383.  Field preemption occurs when a congressional

legislative scheme is "so pervasive as to make the reasonable inference that

Congress left no room for the states to supplement it."  Rice v. Santa Fe Elevator

Corp., 331 U.S. 218, 230, 67 S. Ct. 1146, 1152, 91 L. Ed. 1447 (1947).  Conflict

preemption occurs either when it is physically impossible to comply with both the

federal and the state laws or when the state law stands as an obstacle to the

objective of the federal law.  See Crosby v. Nat'l Foreign Trade Council, 530 U.S.

363, 372-73, 120 S. Ct. 2288, 2294, 147 L. Ed. 2d 352 (2000).

Categories and labels are helpful, but only to a point, and they too often tend

to obfuscate instead of illuminate.  In this particular area, the Supreme Court has

acknowledged the misleading nomenclature for its categories and conceded that

"field preemption may be understood as a species of conflict pre-emption."

30

English v. General Elec. Co., 496 U.S. 72, 79, n. 5, 110 S. Ct. 2270, 2275 n.5, 110 L. Ed. 2d 65 (1990). Commentators have also questioned whether there is a meaningful distinction between "express" and "implied" preemption, since "when we say that a particular sequence of words in a statute 'implies' a given rule, we are merely saying that the rule is part of what that sequence of (express) words means in the context in which is appears." Caleb Nelson, Preemption, 86 Va. L. Rev. 225, 263 (2000); see also Laurence H. Tribe, Constitutional Law § 6-25 at 481 n.14 (2d ed. 1988) (noting that the "three categories of preemption are anything but analytically air-tight," and that "even when Congress declares its preemptive intent in express language, deciding exactly what it meant to preempt often resembles an exercise in implied preemption analysis").

At bottom this is a case about statutory interpretation, viz., whether Congress intended either HAVA or § 1971(a)(2) of the Civil Rights Act to displace state laws like Subsection 6. The Secretary urges us to apply a presumption against preemption because states have traditionally regulated elections. Although his observation of the states' traditional role is well-taken, in practice it is difficult to understand what a presumption in conflict preemption cases amounts to, as we are surely not requiring Congress to state expressly that a given state law is preempted using some formula or magic words. See Irving v. Mazda Motor Corp.,

31

136 F.3d 764, 769 (11th Cir. 1998). Either Congress intended to displace certain state laws or it did not. Federal law is not obliged to bend over backwards to accommodate contradictory state laws, as should be clear from the Supremacy Clause's blanket instruction that federal law is the "supreme Law of the land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, whether an area of law is one of traditional state regulation does not affect whether we will put a thumb on the scale against giving effect to what Congress intended. But hewing to congressional intent cuts both ways. Although we will not apply a presumption to give less preemptive effect than Congress intended, we will also not apply an overly broad construction of the statute's supposed objectives to give more than Congress intended.

HAVA represents Congress's attempt to strike a balance between promoting voter access to ballots on the one hand and preventing voter impersonation fraud on the other. Plaintiffs argue that Subsection 6 conflicts with this balance in three separate instances. First, plaintiffs argue that HAVA section 303(a) conflicts with Subsection 6. Section 303(a) sets forth the requirements for the creation of new state voter registration databases. See 42 U.S.C. § 15483(a). It requires states to keep up-to-date and accurate rolls of registered voters and to eliminate redundant

32

entries.  See id. § 15483(a)(4).  Another provision of the subparagraph also requires registration applicants to provide a unique identification number – either a driver's license number, a Social Security number, or a unique number assigned specifically for this purpose  –  and requires the state to verify this number on new voter registration applications in accordance with a procedure of the state's choosing.  See id. § 15483(a)(5).

Plaintiffs contend that the objective of section 303(a) is to ensure that states keep accurate records of registered voters, and that it was not intended to prescribe matching as a federal precondition for voter registration.  Further, plaintiffs argue that Florida misunderstood what section 303(a) required and consequently acted as though HAVA mandated matching as a precondition to registration, resulting in the enactment of Subsection 6.  The negative implication of section 303(a)'s actual objective is, so it goes, that HAVA prohibits states from using the identification verification process as a basis for excluding otherwise eligible voters.  Assuming that plaintiffs are right that section 303(a)(5) of HAVA does not impose matching as a requirement of voter registration, it also does not seem to prohibit states from implementing it.  See 42 U.S.C. § 15483(a)(5)(A)(iii) ("The State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law.").  Neither test of

conflict preemption pans out for the plaintiffs. It is certainly possible to comply with both HAVA section 303(a) and Subsection 6. Indeed, if plaintiffs are correct that section 303(a) is really just concerned with managing databases, then it has nothing whatsoever to do with the registration requirements of Subsection 6 and cannot be in conflict with it. Plaintiffs have failed to show how making matching a prerequisite to registration undermines the functioning of the database itself, which is, under plaintiffs' own interpretation of the statute, the only objective of section 303(a).

Second, plaintiffs argue that HAVA section 303(b) also conflicts with Subsection 6. At the outset, it is important to point out a crucial difference between the subject matter of Subsection 6 and of section 303(b). Section 303(b) deploys HAVA's provisions against voter impersonation fraud by imposing additional restrictions on those individuals who registered by mail before they can vote either a regular or a provisional ballot. It is not a federal registration provision. Every command in section 303(b) applies only to voters who have already registered – specifically, registered by mail instead of in person – according to the laws of that voter's state. Simplified, section 303(b) requires voters who registered by mail to verify their identify in any one of three ways before casting a regular ballot. First, the voter can present some form of

34

identification from a pre-approved statutory list at the polling location (or send a

copy of the identification with her mail-in vote). See 42 U.S.C. § 15483(b)(2)(A).

The second and third ways of verifying identity in order to vote occur at the point

of registration, but they are not registration requirements under section 303(b).[16]  A

voter can verify her identity either by presenting the same forms of acceptable

identification or by matching up one of her identification numbers (driver's license

or Social Security) when she registers to vote.  Id. § 15483(b)(3)(A)-(B).[17]

Nothing in this provision states or suggests that Congress intended to alter state

registration requirements, and certainly nothing in the section suggests that voters

can bypass state registration requirements entirely as long as they satisfy federal

identification requirements for voting a regular ballot.

To succeed on this argument, plaintiffs would have to demonstrate how a

provision dealing exclusively with voting requirements can be transformed to

conflict with a state statute on registration requirements.  The only argument made

for a textual conflict is that upholding Subsection 6 would render HAVA

section 303(b)(3)(B) superfluous.  Plaintiffs contend that this section, which

---

[16] This is not to be confused with HAVA section 303(a)'s requirement that states refuse to process or accept registration applications without either a driver's license number, the last four digits of the Social Security number, or a unique voter identification number.  See 42 U.S.C. § 15483(a)(5).

[17] The subsection contains a third set of exceptions to the identification requirement created by other federal statutes that are inapposite here.  See 42 U.S.C. 15483(b)(3)(C).

exempts those voters who pass the matching requirement at registration from showing identification at voting, would be unnecessary if Subsection 6 stands because every voter would need to match their Social Security or driver's license numbers at registration. This utterly misapplies the familiar canon of construction that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S. Ct. 441, 449, 151 L. Ed. 2d 339 (2001) (quoting Ducan v. Walker, 533 U.S. 167, 174, 121 S. Ct. 2120, 2125, 150 L. Ed. 2d 251 (2001) (internal quotation marks omitted)). This canon applies when courts are discerning the meanings of different provisions of the same statute, and it instructs that no portion of the statute should be read that would make another part unnecessary. Clearly this is not the case here. Plaintiffs offer no authority or reason to support an application of this canon to two different statutes from two separate sovereigns, and such an approach would be untenable anyway. If courts were to adopt plaintiffs' interpretive method, then every federal statute that is consistent and parallel with a state statute would, paradoxically, have the opposite effect of preempting the state statute since the state statute would otherwise make the federal statute superfluous.

Third, plaintiffs argue that Subsection 6 conflicts with HAVA

36

section 303(b)(2)(B)'s so-called fail-safe voting provision, which states that "[a]n individual who desires to vote in person, but who does not meet the [identification] requirements . . . may cast a provisional ballot" as described in section 302(a) of HAVA. 42 U.S.C. § 15483(b)(2)(B)(i). Section 302(a) of HAVA, in turn, provides that a voter who "does not appear on the official list of eligible voters for the polling place" or who is claimed by the election official not to be an eligible voter, can cast a provisional ballot upon affirming that the voter is registered and is eligible to vote. See 42 U.S.C. § 15482(a). Once the provisional ballot is cast, the election official is to determine whether the individual is "eligible under State law to vote," and the official must count the ballot if the voter is eligible. See id. § 15482(a)(4).

It is not entirely clear what plaintiffs' interpretation of HAVA's provisional ballot provisions is, or where they think the conflict with Subsection 6 lies. HAVA section 302(a) describes general procedures for casting and reviewing provisional ballots; it does not impose any federal standards on voter registration or voter eligibility, both of which remain state decisions. Subsection 6 itself states that a voter who has failed to register due to a mismatch of the identification numbers can cast a provisional ballot, which will be counted if the voter can verify the information provided within two days of the election date. See Fla. Stat.

37

§ 97.053(6). HAVA section 302(a) expressly states that a provisional ballot be counted only if the voter is eligible under state law to vote in that particular election. Registration is an eligibility requirement under the Florida constitution and statutes. See Fla. Const. art. VI; Fla. Stat. § 97.053(2). Subsection 6's provisional ballot measures are consistent with HAVA section 302(a), as both statutes would count only those provisional ballots cast by voters who were eligible – in Florida, registered – to vote in the election.

Perhaps plaintiffs interpret HAVA to mean that any voter eligible to register under state law is entitled to have her provisional ballot count under section 302(a). Commentators have called this interpretation the "substantive vision of provisional voting," which means that "the provisional ballot should count whenever the individual who casts the ballot is someone who substantively has the qualifications necessary to be a registered voter." Edward B. Foley, The Promise and Problems of Provisional Voting, 73 Geo. Wash. L. Rev. 1193, 1194 (2005).[18] Such an interpretation would turn section 302 into a sweeping federal invalidation of state voter registration requirements, and while textually plausible it is not, in our

_____

[18] Contrast this with the "procedural vision" of provisional voting, which means that "if the local election board never officially registered an individual because of an incomplete registration form . . . the individual is out of luck." Edward B. Foley, The Promise and Problems of Provisional Voting, 73 Geo. Wash. L. Rev. 1193, 1195 (2005); see also id. ("The procedural vision of provisional voting . . . mean[s] that if an omission were to be caused by voter error . . . the individual would be stuck with the consequences.").

38

judgment, the intent of Congress in enacting HAVA section 302.

Section 302 states that a voter wishing to cast a provisional ballot must be "registered" to vote in her state and must execute a written affirmation to that effect. It is only after the voter affirms that she is registered and is eligible to vote that she can even fill out a provisional ballot. These parts of section 302 in clear terms indicate that Congress did not intend to do away with the importance and consequences of state registration requirements. Once the provisional ballot has been cast, the state election officials must then "determine[] that the individual is eligible" to vote before counting the ballot. 42 U.S.C. § 15482(a)(4).

It is worth noting that although Congress drew a distinction between a voter being registered and a voter being eligible earlier in the same subsection, see id. § 15482(a)(2)(A)-(B), the verification subsection speaks only of determining whether a voter is "eligible under State law," not whether the voter ever successfully registered. It is plausible to interpret this subsection, and its omission of two words like "and registered," to mean that Congress rewrote all state voter registration law to be nonmandatory for voters wishing to cast a (provisional) ballot, in effect adopting the procedural vision of provisional voting, see supra note 18. Indeed this seems to be the dissent's understanding of Congress's intent behind this provision. See post at 7 n.11. But an equally plausible textual

39

interpretation that is more consistent with congressional intent evidenced by the rest of HAVA is that by the term "eligible under State law," Congress intended to incorporate state law on the issue instead of creating a federal standard. In other words, section 302(a) lets the states decide whether a voter who is not registered but is otherwise eligible to vote should have her provisional ballot counted anyway. Cf. Sandusky County Democratic Party v. Blackwell, 387 F.3d 565, 576 (6th Cir. 2004) (discussing state law that may permit voters to cast provisional ballots outside of their registered precincts). Thus, under HAVA section 302, states can still choose whether they will effectively waive the registration requirement for voters casting provisional ballots. Florida has chosen not to do so, see Fla. Stat. § 97.041(1)(a)(5); id. at § 97.041(1)(b)(3), and that decision conflicts with neither section 302(a) nor with section 303(b)(2)(B) of HAVA.[19]

It is appropriate now to look through a wider lens, lest we miss the forest of Congress's intent for the trees of HAVA's clumsy subsections and clauses. Plaintiffs' preemption argument comes down to the claim that HAVA presents a

---

[19] Under the dissent's interpretation of section 302(a), there would be no reason for Congress to include the requirement that the voter affirm that she "is a registered voter" since anyone eligible to register but who did not successfully register could still cast a provisional ballot. This interpretation greatly expands provisional voting beyond the group of voters it was intended to protect, namely those who had successfully registered but were still somehow left off the rolls. The provisional voters envisioned by the dissent would have already received notice that their applications were incomplete and that they are consequently not registered, making them ineligible to invoke section 302(a).

fixed federal standard for the identification requirements that states may impose on individual voters, and that any state standard more demanding or burdensome must give way. Subsection 6 is and was intended to be such an identity verification provision that is unquestionably more demanding and less flexible than the alternative methods of identity verification provided by HAVA. The question remains whether Subsection 6 sufficiently impedes HAVA's objectives as to be preempted by it. See Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98, 112 S. Ct. 2374, 2383 120 L. Ed. 2d 73 (1992) ("[The] ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole."). Plaintiffs argue that HAVA's standards for voter identification are in effect the national maximum (and presumably minimum as well) that any state may impose on voters.

Reading HAVA Title III as a whole, we are not convinced that its objectives are to federalize voter identification standards. First, at multiple points throughout the statute, HAVA dynamically incorporates state law requirements instead of promulgating national standards. See 42 U.S.C. § 15482(a)(4); § 15483(a)(5)(A)(iii); § 15484; § 15485. Repeatedly adapting state laws does not reflect an intent to prescribe a uniform national standard in the general legislative scheme. Second, section 304 of HAVA states explicitly that "[t]he requirements

41

established by this subchapter are minimum requirements." Id. § 15484. Plaintiffs point out that the section goes on to say that stricter state requirements for "election technology and administration" cannot be "inconsistent with the Federal requirements." Id. Although this congressional hedge means that HAVA section 304 is not a silver bullet for the Secretary's position, it also throws some doubt on plaintiffs' claim that HAVA evinces a uniform national voter identification policy as it clearly contemplates the existence of requirements more restrictive than the federal minimum. As discussed above, plaintiffs have been unable to show how Subsection 6 is inconsistent with any of the specific "requirements" of HAVA. Their argument that it is inconsistent with some more nebulous conception of HAVA's objective fails once we recognize that on issues relating to voter registration and identification not specifically addressed by HAVA, Congress essentially punted to the states.

Third, if HAVA were intended to preempt all state laws like Subsection 6, then we would expect to see a more comprehensive regulation of voter registration and identification. Instead, what we actually have in HAVA section 303(b) is a provision covering only mail-in registrants. There is nothing at all in the statute that discusses the requirements and procedures for establishing eligibility and identity of in-person registrants. Thus, so far as the specific requirements of

42

HAVA section 303(b) are concerned, we must conclude that Congress left it entirely up to the states to prescribe the requirements for in-person registrants. Under plaintiffs' own interpretation, section 303(b) would preempt Subsection 6 as applied to mail-in registrants whose Social Security and drivers' license numbers failed to match, but not as applied to in-person registrants who had the same problem. Yet this would mean that section 303(b) would be more protective of mail-in registrants – the very group upon whom Congress imposed additional federal identification requirements to counteract greater perceived risks of impersonation fraud – than of in-person registrants in states like Florida. If Congress had wanted the verification methods described in section 303(b) to apply to all voters nationally, it would have said so. If it had intended even less demanding methods to apply nationally for in-person registrants, it would have said that as well. The fact that the statute addresses only one specific subgroup of registrants is more consistent with the Secretary's interpretation of HAVA – that it created some minimum verification procedures for one specific group where concerns of fraud were particularly high but otherwise left the states free to draw up their own voter identification measures.

V.

We next consider whether Subsection 6 conflicts with § 1971(a) of the Civil

43

Rights Act.[20]  As with the analysis of HAVA, the task with § 1971(a) is determining whether Subsection 6 stands as an obstacle to the objectives of the federal statute.  We conclude that it does not.

Section 1971(a)(2)(B) was originally enacted as part of Title I of the Civil Rights Act of 1964, Pub. L. 88-352, § 101, 78 Stat. 241.  The measure was at the time the latest entry in a spurt of federal enforcement of voting rights after a long slumber following syncopated efforts during Reconstruction.  Statutes enacted in 1870, 1871, 1957, and 1960 had all been unsuccessful attempts to counteract state and local government tactics of using, among other things, burdensome registration requirements to disenfranchise African-Americans.  See Condon v. Reno, 913 F. Supp. 946, 949-50 (D.S.C. 1995).  This latest addition to federal law was "necessary to sweep away such tactics as disqualifying an applicant who failed to list the exact number of months and days in his age."  Id. at 950.  Such trivial information served no purpose other than as a means of inducing voter-generated errors that could be used to justify rejecting applicants.

The requirements of Subsection 6 are, of course, not trivial or irrelevant in

---

[20] The relevant portion of the statute reads:
(2) No person acting under color of state law shall–
(B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application [or] registration . . . if such error or omission is not material in determining whether [the] individual is qualified under State law to vote in such election.
42 U.S.C. § 1971(a)(2)(B).

the way that the specific kinds of information requests targeted by Congress in enacting § 1971(a)(2)(B) were trivial. Although Subsection 6 does not present a paradigmatic violation of § 1971(a)(2)(B), we recognize that Congress in combating specific evils might choose a broader remedy. See Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206, 118 S. Ct. 1952, 1956, 141 L. Ed. 2d 215 (1998); N.H. Motor Transp. Ass'n v. Rowe, 448 F.3d 66, 77 (1st Cir. 2006). The text of the resulting statute, and not the historically motivating examples of intentional and overt racial discrimination, is thus the appropriate starting point of inquiry in discerning congressional intent.

The text of § 1971(a)(2)(B) prohibits denying the right to vote based on errors or omissions that are not material in determining voter eligibility. See 42 U.S.C. § 1971(a)(2)(B). The term "material" not surprisingly signifies different degrees of importance in different legal contexts. In constitutionalized criminal procedure, exculpatory evidence is "material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v, Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985). In the voluminous jurisprudence of section 10b of the 1934 Securities Exchange Act and Rule 10b-5, a misrepresentation or omission is material if and only if there is a "substantial

likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976).

However, in the federal criminal mail and wire fraud context, materiality seems to take on a much lower evidentiary threshold, for "a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." United States v. Gray, 367 F.3d 1263, 1272 n.19 (11th Cir. 2004) (quoting Neder v. United States, 527 U.S. 1, 15, 119 S. Ct. 1827, 1837, 144 L. Ed. 2d 35 (1999) (internal quotation marks omitted)). Similarly, in the context of sentencing range enhancements for concealing evidence under the federal Sentencing Guidelines, we have observed that the threshold for materiality is "conspicuously low," such that material information is "information that, if believed, would tend to influence or affect the issue under determination." United States v. Dedeker, 961 F.2d 164, 167 (11th Cir. 1992) (quoting U.S.S.G. § 3C1.1, comment. (n. 5) (internal quotation marks omitted)).

Roughly speaking, there appears to be two kinds of "materiality," one similar to minimal relevance and the other closer to outcome-determinative. If

materiality in the context of § 1971(a)(2)(B) means minimal relevance, then it is clear that a failure to match the information required under Subsection 6 is "material" to determining voter eligibility. An application that fails to match up the identification numbers tends to make it more likely that the applicant is not a qualified voter than if the numbers had matched.

If materiality means something more like outcome-determinative, then the Secretary would have to meet a higher burden in demonstrating that the information required to make a match is necessary or sufficient, along with other information available, to determining eligibility. Fortunately for the Secretary, Congress has already resolved this potentially difficult issue in his favor by enacting HAVA section 303(a). The fact that HAVA section 303(a) requires states to obtain the applicant's identification numbers before accepting a registration application and also to "determine whether the information provided . . . is sufficient to meet [that] requirement[]" indicates that Congress deemed the identification numbers material to determining eligibility to register and to vote.[21] 42 U.S.C. § 15483(a)(5)(A)(iii). Moreover, the section 303(a)(5) issues this

---

[21] To be sure, HAVA also does not require that states authenticate these numbers by matching them against existing databases. It is explicit that states are to make determinations of validity in accordance with state law. States are therefore free to accept the numbers provided on application form, which at least in Florida are completed with an oath or affirmation under penalty of perjury, as self-authenticating. This does not alter the materiality of the information itself.

directive to states "notwithstanding any other provision of law," which of course includes the temporally prior § 1971(a)(2)(B). See 42 U.S.C. § 15483(a)(5)(A)(i). We doubt that Congress would mandate the gathering of information – indeed, that it would make that a precondition for accepting registration application – that it also deems immaterial. Read together, HAVA section 303(a) removes specific kinds of information from § 1971(a)'s domain by making those kinds of information automatically material.[22]

Plaintiffs argue that whether or not the underlying information sought by the registration is material, an error caused by a typo cannot be material because it does not reflect the absence of any actual, substantive element that makes the applicant ineligible. The mistaken premise in this argument is that the materiality provision refers to the nature of the error rather than the nature of the underlying information requested. If plaintiffs were correct and materiality refers

---

[22] In a way, this issue in this case is the mirror image of the one decided in Schwier v. Cox, 412 F. Supp. 2d 1266 (N.D. Ga. 2005), aff'd 439 F.3d 1285 (11th Cir. 2006). Schwier involved a challenge to Georgia's Voter Registration Form, which had required the plaintiff applicants to disclose their full Social Security numbers to be verified. The district court held, and we affirmed, that the Georgia law conflicted with § 1971(a)(2)(B)'s materiality provision because Congress had made it illegal in a different statute, section 7(b) of the Privacy Act, 5 U.S.C. § 552a (note), to mandate the disclosure of one's complete Social Security number without providing certain information and notice to the individual. See Schwier, 412 F. Supp. 2d at 1274-75. Because the Georgia registration form ran afoul of the section 7(b) of the Privacy Act, the Social Security number was per se immaterial under § 1971(a)(2)(B). Here, because Congress required the identification numbers to be on voter registration applications, they are per se material under § 1971(a)(2)(B).

to the fact of the error itself, then no error would ever be material because an error by definition mistakenly and incorrectly represents the underlying substantive element of eligibility. A more sound interpretation of § 1971(a)(2)(B) asks whether, accepting the error as true and correct, the information contained in the error is material to determining the eligibility of the applicant. As discussed above, HAVA makes that information material.[23]

Ultimately, the thrust of plaintiffs' argument is not that the information sought by HAVA and Subsection 6 are immaterial, but that the likelihood of error combined with the consequences are unjustifiably burdensome on the applicant in light of other available and more error-tolerant ways of verifying identity, and in light of the overall balance of effects on social utility. That is an argument for another day. Section 1971(a)(2)(B) does not establish a least-restrictive-alternative test for voter registration applications in the plain text of the statute, and we are

---

[23] The standard that the dissent proposes, that an error is immaterial if it would not "preclude a reasonable election official from identifying the applicant," post at 15, works only when the applicant has brought it to the election official's attention that the mismatch is in fact an error by presenting proof of her identity and eligibility. Without this additional identifying information, such as a copy of the applicant's driver's license, it would be impossible to tell whether the applicant's error was major, minor, or indeed an error at all (as opposed to an actual attempt at fraudulently registering). However, with this additional information, the election official will always be able to verify identity of the applicant. It is this additional information exclusively – and not the degree to which that new information deviates from the information on the registration application form, or the "nature of the error," post at 15 – that enables the election official to ascertain the identity of the voter. Thus, under this approach no error can ever be material.

49

unable to discern the imposition that tests as an objective of the statute.  Finding no

conflict between Subsection 6 and § 1971(a)(2)(B) of the Civil Rights Act, we

conclude that the Florida law is not preempted.

V.

For the foregoing reasons, we affirm the district court's decision that

plaintiffs have standing to prosecute this lawsuit, and we reverse its decision

granting plaintiffs a preliminary injunction.  The case is remanded for further

proceedings not inconsistent herewith.

SO ORDERED.

BARKETT, Circuit Judge, CONCURRING in part, DISSENTING in part:

I agree with the majority that Plaintiffs have standing in this case. However, I dissent from the majority's determination that Plaintiffs are not entitled to a preliminary injunction against the enforcement of Florida Statutes § 97.053(6) ("Subsection 6"), which impermissibly disenfranchises Florida citizens.

In 2006, Florida added a provision to its voter registration process, Subsection 6,[1] that requires "matching" a voter's driver's license or social security number <u>on his or her application</u> to an official database.[2] Florida and the majority read this provision to say that the match from the official database must be, not to the actual and valid driver's license or social security card, but to the name and number placed on the registration application. Under the majority's interpretation of this provision, regardless of an applicant's proof of eligibility, any provisional vote legitimately cast in an election will not be counted if an applicant's name or number is erroneously <u>copied</u> onto the application form. An individual's ability to

---

[1] Only three other states currently have schemes similar to Subsection 6. Most states that adopted matching schemes have done away with them. For example, after implementing matching schemes, several states—including Pennsylvania, California, and Maryland—abandoned those registration systems after thousands of eligible voters were being denied the right to vote. <u>See, e.g.</u>, Cal. Code Regs. tit. 2, §§ 20108.38(c), 20108.65(e), 20108.70(c), 20108.71; Md. Code Regs. §§ 33.05.04.04(A)(3), (B)(3)–(4), 33.05.04.05(C)(5). In Washington State, a district court recently enjoined the state government from enforcing a similar matching scheme. <u>See</u> <u>Wash. Ass'n of Churches v. Reed</u>, 492 F. Supp. 2d 1264 (W.D. Wash. 2006).

[2] This requirement, however, applies only to new voters, not to those already registered prior to the enactment of Subsection 6, treating new voters and "old" voters differently.

51

cast a provisional ballot therefore turns not on whether he or she is <u>eligible</u> to vote, but on whether the name or number on the registration application contains a mistake.

Such a requirement for voting violates the Help America Vote Act of 2002 ("HAVA"), the Voting Rights Act, and the First and Fourteenth Amendments of the Constitution. Moreover, I cannot believe that this interpretation was intended by the Florida legislature. It is inconceivable that a state would intend that a typographical or transpositional error on a registration application could not be corrected through irrefutable proof of a valid driver's license or social security card to permit a Florida citizen's vote to be counted. The right to vote is a "fundamental matter in a free and democratic society." <u>Reynolds v. Sims</u>, 377 U.S. 533, 561–62 (1964), and pursuant to Subsection 6, Florida has impermissibly deprived a class of over 14,000 citizens[3]—the vast majority of whom are minorities[4]—that fundamental right.

---

[3] Between the effective date of Subsection 6—i.e., January 1, 2006—and October 10, 2007, at least 14,326 Florida citizens were excluded from the Florida registration list because of non-verification. As of the November 2006 general election, that number was 12,804.

[4] For example, African-Americans make up 13% of the applicant pool, but 26% of the unmatched voter pool. Similarly, Hispanic-Americans comprise 15% of the applicant pool, but 39% of the unmatched voter pool. To show the sharp contrast and illustrate how Subsection 6 affects minorities to a much larger extent, whites make up 66% of the applicant pool but only 17% of the unmatched voter pool. Because minority communities often have names that are unfamiliar to data-entry processors, and because they are more likely than whites to have hyphenated or compound names, the database entries are more likely to not match for minorities.

I. Florida's "Matching" Requirement[5]

For a voter registration application to be "complete,"[6] an applicant must not only satisfy the qualifications to register to vote,[7] but the state must also match "[t]he applicant's . . . driver's license number" or "the last four digits of the applicant's social security number"[8] to the database of either the Florida Department of Highway Safety and Motor Vehicles ("DHSMV") or the Social Security Administration ("SSA"). Fla. Stat. § 97.053(5)(a)–(b), (6). An "incomplete" application because of non-matching will be rejected and the

_____

[5] The matching scheme in itself is problematic because of the numerous administrative and technological barriers, such as computer glitches or human error that make the possibility of non-matches for qualified voters a strong possibility. However, I focus this dissent, primarily the statutory sections, on the fact that if a mistake is made by an applicant who then votes provisionally, that vote will never be counted even if the applicant provides valid documentation—either a driver's license or social security card—which clearly verifies the voter's identity. Most other states do not have this problem. For example, in California, if an applicant cannot be matched to a database but is otherwise eligible to vote, the state can assign that applicant a unique identifying number. Cf. Cal. Code Regs. tit. 2, §§ 20108.38(c), 20108.65(e), 20108.70(c), 20108.71

[6] Under Florida law, "[a] voter registration application is complete and becomes the official voter registration record of that applicant when all information necessary to establish the applicant's eligibility pursuant to s. 97.041 is received by a voter registration official and verified pursuant to [Subsection 6]." Fla. Stat. § 97.053(2).

[7] Section 97.041 sets forth the "qualifications to register to vote," which include that a person (1) must be at least eighteen years of age, (2) is a U.S. citizen, (3) is a legal resident of Florida, (4) is a legal resident of the county in which they seek to register, (5) has not been adjudicated mentally incapacitated, and (6) has not been convicted as a felon. Id. § 97.041.

[8] An applicant may also provide an identification number from a Florida identification card issued pursuant to Florida Statutes § 322.051. Throughout this dissent, I shall refer to "driver's license numbers" for both driver's license numbers as well as identification card numbers. Driver's license numbers and social security numbers shall collectively be referred to as "identifying numbers," "applicants' numbers," or "numbers."

applicant's name will not be placed on the voter rolls prepared for election day. However, such an applicant could vote provisionally, the validity of that vote being subject to the applicant correctly "completing" her application within two days following an election.[9]

The state and the majority take the position that such a provisional ballot may be counted <u>only</u> if the state made the mistake in the matching process but <u>not</u> if that very same mistake was made by the applicant. If an election official transposes two numbers or omits a letter, hyphen, or suffix from a name on a registration application when entering that information into the state's voter database, resulting in a non-match with either the DHSMV or SSA database, that applicant's provisional ballot will be counted upon presentation of a valid driver's

---

[9] Although a voter could cure her non-match prior to the registration book-closing deadline, <u>see</u> Fla. Stat. § 97.052, this is not always possible, because voters often receive notices of "incomplete" applications after the book-closing deadline. Furthermore, for a voter who registers, for example, on the last day before the book-closing deadline and the state determines that her application is unmatched, there is no way in which she could cure her non-match prior to the book-closing deadline. In Florida, the book-closing deadline is on the twenty-ninth day before an election. <u>See id.</u> § 97.055. For example, the book-closing deadline for the January 28, 2008 presidential preference primary was December 29, 2007.

The applicant was previously given three days to verify the authenticity of her application but as part of the 2007 amendment to Subsection 6 (s. 13, ch. 2007-30), the Florida legislature substituted "second day" for "third day," now giving an applicant only forty-eight hours to provide documentation matching her application information. This amendment took effect on January 1, 2008. The state has sought preclearance of this amendment with the U.S. Attorney General. However, on January 23, 2008, the U.S. Department of Justice informed the state that because the U.S. District Court for the Northern District of Florida had enjoined enforcement of Subsection 6, the proposed change was not ripe for review by the U.S. Attorney General.

54

license or social security card.  Id. § 97.053(6).  However, if the applicant makes the very same mistake on her application, then no matter what irrefutable proof she provides of her identity and eligibility to vote, including a valid driver's license or social security card, her provisional ballot will <u>never</u> be counted.

This inconsistency in the treatment of provisional ballots is compounded by the fact that there is no provision under Florida law that addresses disputes regarding whether the mistake was made by the applicant or by an election official. For example, an applicant may well argue that her application is correct, but that an election official misread the application by seeing a "7 " where the applicant wrote the number "1," or by construing the number "5" as the letter "S."[10]

For the reasons more fully explained below, permitting Florida to disenfranchise voters under this scheme violates both federal law and the Constitution.

II.  <u>Subsection 6 Conflicts With HAVA.</u>

As a result of the voting difficulties experienced during the 2000 presidential election, Congress passed HAVA in order to make sweeping reforms to our

---

[10] As an additional example, if a blind or otherwise physically-disabled applicant needs the assistance of an election official in filling out her application and an error results on her application, are we to assume that the applicant gave the election official an incorrect sequence of numbers or that the election official simply misunderstood the applicant in transposing two numbers on her application?

nation's voting processes, including states' registration processes.  See 42 U.S.C. § 15301 et seq.  Any method used by a state in conducting voter registration must now take into account HAVA's goals in promoting methods of voting and administering elections which are "the most convenient, accessible, and easy to use for voters" and which are "nondiscriminatory and afford each registered and eligible voter an equal opportunity to vote and have that vote counted."  Id. § 15381(a)(1) & (3), (b)(3) (emphasis added).

Among the methods utilized to promote these goals, Section 302 of HAVA provides for the casting of provisional ballots.  See id. § 15482.  Under Section 303(b)(2)(B) (the "fail-safe voting" provision), an individual who does not meet the identification requirements for voting in-person or by mail under Section 303(b)(2)(A) may cast a provisional ballot in accordance with Section 302(a).  Id. § 15483(b)(2)(A)–(B).  If an individual does not appear on a registration list or an election official determines that she is not eligible to vote, Section 302(a) provides that an individual "shall be permitted to cast a provisional ballot" if she affirms to an election official that she is a registered and eligible voter.  Id. § 15482(a)(2)(A)–(B).  This must simply mean that the voter believes herself to have adequately registered.  Thereafter, an election official must determine only that the individual is "eligible under State law" to vote, in which case her provisional ballot will be

56

counted. Id. § 15482(a)(4).[11] The intent behind this section was to permit voters to prove within a reasonable time after an election that they are, in fact, eligible voters and the state's initial view to the contrary was erroneous.

However, Subsection 6 completely eviscerates provisional balloting for a group of otherwise eligible voters who make a minor mistake on their registration applications.[12] Subsection 6 permits voters to cast a provisional ballot which will be counted only if applicants present evidence—their driver's license or social security card—which verifies the number "provided on [their] application," Fla. Stat. § 97.053(6) (emphasis added). This is impossible if an applicant has made a minor mistake in writing her name or number on her application. An actual, valid

---

[11] Nowhere in that subsection is there a requirement that the election official verify that the applicant is registered to vote. The majority concedes that this is a "plausible" interpretation of Section 302(a) but chooses to interpret HAVA differently, thereby allowing Florida's matching scheme under Subsection 6. Given the full purposes of HAVA and the constitutional problems raised by such an interpretation, which the majority ignores, its analysis of provisional balloting under HAVA is much too narrow and incomplete.

The majority takes the position that there would be no reason to have a voter affirm that she "is a registered voter" if anyone eligible to register but who was not successful in registering can still cast a provisional ballot. (Maj. Op. at 40 n.19.) The majority fails to take into account voter registration processes, where voters all too often do not receive the requisite notice to know whether they have been successfully registered and will go to the polls believing themselves registered to vote. The affirmation requirement under Section 302(a) is distinct from the verification process. It requires that the voter simply claim that she believes herself to be registered, not that the state has in fact registered her to vote.

[12] I do not address the other two arguments related to HAVA, that (1) Subsection 6 conflicts with Section 303(b)(3)(B) of HAVA and (2) that Subsection 6 violates the purpose and meaning behind HAVA's "Computerized Statewide Voter Registration List Requirements." While I think these claims have merit, as I noted earlier, the greatest conflict between HAVA and Subsection 6 is the effacement of provisional balloting for a certain group of otherwise eligible voters.

57

driver's license or social security number will never match the registration application upon which two numbers might have been transposed, or upon which a letter or hyphen might have been inadvertently omitted from a name. According to the state, it is the match itself, not the validity of the requested information, that is determinative of a vote being counted. Thus, when an applicant makes a minor mistake on her registration application, the majority says that Florida is free to disregard HAVA's provisions for provisional balloting. This view nullifies provisional balloting for those voters who are clearly eligible but for a minor error on their applications.

As the majority notes, "[t]he question remains whether Subsection 6 sufficiently impedes HAVA's objectives as to be preempted by it." (Maj. Op. at 41.) For any court, "[the] ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole." Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992). If a challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," then it is preempted by federal law. Hines v. Davidowitz, 312 U.S. 52, 66–67 (1941); Pharm. Research & Mfrs. of America v. Meadows, 304 F.3d 1197, 1205 (11th Cir. 2002).[13] In determining

_____

[13] Contrary to the state's argument, there is no presumption against preemption. As this court has stated, "[w]hen considering implied preemption, no presumption against preemption

58

what is a "sufficient obstacle," we look to the federal statute as a whole and identify its purpose and intended effects. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000).[14]

The majority reads HAVA as authorizing the administrative matching of numbers and letters as a precondition to registration. This misreading clearly conflicts with HAVA's objectives of promoting accessible and non-discriminatory methods of voting that minimize voter disenfranchisement. These objectives preclude states from using the identification-verification process as a basis for excluding actually qualified voters. While I certainly agree that states have the right to "determine whether the information provided by an individual is sufficient to meet the requirements [for voter registration under HAVA], in accordance with State law," see 42 U.S.C. § 15483(a)(5)(A)(iii), they cannot do so in a way that

---

exists." Irving v. Mazda Motor Corp., 136 F.3d 764, 769 (11th Cir. 1998). "Under the Supremacy Clause of the Federal Constitution, the relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." Lewis v. Brunswick Corp., 107 F.3d 1494, 1502 (11th Cir. 1997) (internal quotation marks omitted) (citing Felder v. Casey, 487 U.S. 131, 138 (1988)).

[14] "For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." Savage v. Jones, 225 U.S. 501, 533 (1912), quoted in Crosby, 530 U.S. at 373.

would prevent a clearly and undisputedly eligible voter from having her vote counted.

Although the majority states that we should look at HAVA through a "wider lens" so that we do not overlook Congress' intent in enacting HAVA at the expense of "HAVA's clumsy subsections and clauses" (Maj. Op. at 40), the majority fails to do what it says: to specifically look at Subsection 6 in light of HAVA's purposes. Instead, the majority begs the question by holding that Subsection 6 is permissible because Congress did not intend to prescribe uniform national standards for both voter registration and identification. (See id. at 42–44.)

The majority reasons that because Congress did not impose uniform national standards for voter registration when it enacted HAVA, the implication is that Congress left room for states to "supplement" HAVA's provisions with laws such as Subsection 6. (See id. at 31–32 (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)); see also id. at 42–44.) But HAVA does not need to prescribe uniform national standards for voter registration in order for HAVA to preempt Subsection 6.[15] Although not preempting all state registration and

_____

[15] The majority argues that because Section 303(b) of HAVA only applies to mail-in registrants, Congress left it "entirely" up to the states to decide what the requirements for in-person registrants should be. (Maj. Op. at 42–43.) That cannot be the case. A state is not free to enact whatever in-person, or mail-in, registration laws it wants without regard for the underlying purposes of HAVA as well as any provision of HAVA which may conflict with a state's specific choice of registration laws.

identification laws, under the doctrine of conflict preemption, HAVA will preempt those state laws that act as "obstacle[s] to the accomplishment and execution of the full purposes and objectives of Congress." Hines, 312 U.S. at 66–67 (emphasis added). The Supreme Court was explicit when it stated that if there is "any conflict" with a federal statute, the state law in question is preempted. Crosby, 530 U.S. at 372 (emphasis added) (citing California v. ARC Am. Corp., 490 U.S. 93, 101 (1989)). Subsection 6 is such a law, and thus, preempted by HAVA.

Furthermore, as explained later herein, by interpreting HAVA as allowing Florida to make administrative matching and verification a precondition of eligibility, Subsection 6 fails to pass constitutional muster. Given the choice between two interpretations of a federal statute, we should choose the one that does not deprive citizens of their fundamental constitutional rights. If we are to seriously strive in upholding the integrity of elections, citizens must be given at a bare minimum a fair opportunity to vote. The state's concern with fraud is not a one-way street: not only must the government make sure that individuals are not voting fraudulently, but the government must not fraudulently deprive its citizens of their lawful right to vote. With no evidence of voter fraud in Florida, and with the undisputed fact that over 14,000 individuals to date have been denied their right to vote simply because their applications have not been administratively

61

matched, even though they may be able to prove their eligibility to vote,

Subsection 6 conflicts with HAVA and is preempted by it.

III. Subsection 6 Violates the Voting Rights Act.

Florida's matching scheme also violates the Voting Rights Act ("VRA"). The VRA, "and its grant of authority to the federal courts to uncover official efforts to abridge minorities' right to vote, has been of vital importance in eradicating invidious discrimination from the electoral process." Miller v. Johnson, 515 U.S. 900, 927 (1995). Specifically, the VRA provides that no person shall be denied the right to vote "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 42 U.S.C. § 1971(a)(2)(B).[16]

This provision—known as the "materiality provision"—was created "to eliminate practices that could encumber an individual's ability to register to vote." Friedman v. Snipes, 345 F. Supp. 2d 1356, 1371 (S.D. Fla. 2004); see also McKay v. Altobello, No. 96-3458, 1996 U.S. Dist. LEXIS 16651, at *3 (E.D. La. Oct. 31,

---

[16] For purposes of § 1971, "vote" includes "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election." 42 U.S.C. § 1971(e).

62

1996) (The materiality provision "is an anti-discrimination statute designed to eliminate the discriminatory practices of registrars through arbitrary enforcement of registration requirements. It addresses errors and accidental omissions in registration, not the intentional refusal to provide required information."); Condon v. Reno, 913 F. Supp. 946, 949 (D.S.C. 1995) (noting that Congress enacted the VRA to "deal with the problem of registering as a deterrent to voting").

Although the majority acknowledges that Congress enacted the VRA as a means of combating "burdensome [state] registration requirements to disenfranchise African-Americans," its test of "materiality" pays only lip-service to, and would frustrate, that very purpose. (Maj. Op. at 43–45.)

To determine whether an error is material, the majority's test ignores the nature of the error and asks solely whether the underlying information containing the error is relevant in determining an applicant's eligibility to vote. I agree that this is a necessary first step. If the information is not material in determining the eligibility of the applicant, it follows that any error or omission in reporting that information necessarily would not be material and there would be no need for further analysis. See, e.g., Schwier v. Cox, 439 F.3d 1285, 1286 (11th Cir. 2006). But Congress recognized in passing the VRA that discriminatory registration requirements are more sophisticated and pernicious than simply asking applicants

63

for immaterial information. Its concern was not merely with overtly discriminatory requirements that ask for irrelevant information, but also with requirements that ask for relevant information but disproportionately penalize applicants for trivial mistakes.

For example, the court in <u>Condon</u> recognized that Congress intended the VRA to eliminate the practice of disqualifying applicants who make mistakes when asked to "list the exact number of months and days in [their] age." 913 F. Supp. at 950. The majority recognizes that Congress sought to end such insidious practices, (<u>see</u> Maj. Op. at 44), but under its test for materiality, it would have to find the practice discussed in <u>Condon</u> <u>permissible</u> because the underlying substantive information sought—the age of the applicant—is material in determining whether the applicant is eligible. As this application of the majority's test makes clear, it is insufficient to look solely at the "nature of the underlying information requested," (<u>id.</u> at 48), to determine the materiality of an error or omission.

Therefore, even taking as true the majority's contention that an applicant's driver's license or social security number is per se material because of HAVA, (which I do not),[17] that fact alone does not end the materiality inquiry in assessing

---

[17] I do not believe this to be the case as HAVA does not require states to verify an applicant's identifying number. If a state is not required to verify an applicant's identifying

64

errors under Florida's matching scheme. The nature of the error must also be considered. Under Florida's scheme, an applicant with a hyphenated last name would have her application denied if the databases did not include the hyphen; similarly, an applicant who failed to include a suffix such as "Jr." or "Sr." would have his application denied. Even though the information sought is clearly relevant, these small inconsistencies would not preclude a reasonable election official from identifying the applicant and, thus, should not be considered either a material error or omission.[18] Similarly, the accidental transposition of two

number, then HAVA does not automatically make such information material because an individual in a state without a matching scheme could provide her driver's license or social security number and even though she may have transposed two numbers of her application, that immaterial error would not prevent her from voting in that state. Furthermore, the information cannot be per se material because HAVA provides for the assignment of a unique identifying number, which does not have to be matched, for those individuals who do not have a driver's license or social security number. The information also cannot be per se material if a state such as North Dakota is allowed to hold federal elections without any registration requirements.

[18] The majority argues that this standard—that an error is immaterial if it does not preclude a reasonable election official from identifying the applicant—only works if the applicant presents proof of her identity or eligibility. (Maj. Op. at 49 n.23.) This is simply not true. If all of an applicant's registration information matches a database but for a missing hyphen, this minor error would not preclude a reasonable election official from determining that a voter is eligible based solely on the information provided on the application itself, not based on the applicant presenting additional identifying information. Additionally, the majority argues no error could ever be material if the nature of the error is considered because an election official will always be able to verify the identity of an applicant if she presents additional identifying information. (Id.) This also misconstrues the inquiry. There are certain errors that are of sufficient magnitude that a reasonable election official would not be able to verify an applicant's eligibility regardless of the additional identifying information provided. For example, if an unmatched applicant wrote "José Lopez" as his name on his application but later presented identifying information with the name "Juan Lobo," a reasonable election official would not be able to determine the applicant's eligibility. The materiality of this error, or the degree to which the new information deviates from the information on the application, is of such magnitude that the applicant could not be registered based simply on the additional identifying information,

65

numbers from a driver's license or social security number is not a material error under the VRA.[19]  These are the very mistakes that Congress intended to prevent states from using as "burdensome" barriers to registration.

Furthermore, the state's own practices confirm that a minor error on an application, in and of itself, is not immutably material.  At oral argument, the state admitted that when it makes similar mistakes, applicants are allowed to cure those mistakes after casting a provisional ballot.  Thus, if an applicant is able to correct an error made by the state, a similar error made by a voter without a meaningful opportunity to cure that error cannot be material in determining eligibility.

The VRA simply does not countenance the inhumanly strict precision demanded by Florida's matching scheme.

---

thereby ensuring that applicants are not fraudulently attempting to register.

[19] The state argues that the materiality provision only applies to errors or omissions "on any record or paper" whereas this case is only about errors in the treatment or processing of voter registration applications.  This argument is meritless.  The state's interpretation of the materiality provision would lead to the absurd result that the state could commit an inordinate number of errors and omissions and remain immune from challenge under 42 U.S.C. § 1971(a)(2)(B) because the errors or omissions did not occur on the application forms themselves.  Under this legal regime, the state would be free to treat and process applications however it deemed appropriate, with no safeguards for voters under the materiality provision.  By confining the materiality provision to voter registration application forms, the state is seeking to flout the goals behind the VRA, providing itself "an excuse to disqualify potential voters." Schwier, 340 F.3d at 1294.  The materiality provision applies to errors or omissions on "any record or paper."  Nowhere does the statute define "record or paper" as meaning only application forms.

IV. Subsection 6 Violates the U.S. Constitution.

Although I recognize that the constitutional questions were not decided below, it is necessary to address them here because the majority's reading of HAVA and the VRA leaves Florida citizens without any statutory basis upon which to contest the lawfulness of Subsection 6. While it is a "principle of judicial restraint" that courts should "avoid reaching constitutional questions in advance of the necessity of deciding them," Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988), this principle does not dictate that constitutional questions be avoided at all costs, but rather that a court address statutory questions before constitutional ones. United States v. Odom, 252 F.3d 1289, 1293 (11th Cir. 2001). The district court did so, resolving the issue without implicating any constitutional concerns.[20] However, Florida's matching scheme, as enacted and implemented by the state and validated by the majority, violates both the Due Process and Equal Protection Clauses of the Fourteenth Amendment and places an undue burden on the right to vote in violation of the First and Fourteenth Amendments.[21]

---

[20] The district court did not reach the merits of Plaintiffs' constitutional claims because it found the statutory claims sufficient to grant Plaintiffs' request for a preliminary injunction. However, the court found that Plaintiffs' allegations were sufficient to state constitutional claims and therefore, denied the state's motion to dismiss those claims.

[21] The Fourteenth Amendment provides, in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor

A.  Subsection 6 Violates the Due Process Clause of the Fourteenth Amendment.

When an election process "reache[s] the point of patent and fundamental unfairness," there is a due process violation.  Roe v. Alabama, 43 F.3d 574, 580 (11th Cir. 1995) (citing Curry v. Baker, 802 F.2d 1302, 1315 (11th Cir. 1986)).  While there is no bright line in determining when an election process has reached the level of "patent and fundamental unfairness," this is not an "ordinary dispute over the counting and marking of ballots" or a simple "deviation from absolute accuracy."  See Curry, 802 F.2d at 1316.  Rather, we are faced with a registration system plagued by the inadequacy of notices sent to unmatched registrants, the lack of adequate process to correct minor mistakes, and the outright refusal to count provisional ballots because of minor mistakes.  All of these critical problems with Florida's registration system render the election process under Subsection 6 patently and fundamentally unfair.

Under Florida's matching scheme, Florida's sixty-seven counties are free to provide, and actually do provide, notices different in content and form to applicants whose registration applications have been rejected.  These notices to unmatched applicants are wholly inadequate to ensure that voters are given a fair

---

shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

68

opportunity to not only cast a ballot, but to have their ballot counted. As the majority concedes, the notices sent to unmatched applicants are "generic," simply advising an applicant that she is not registered because her application was "incomplete" or "incorrect."

The "generic" notices do not tell applicants what is required to cure an erroneous application. There is no explanation that the rejection was due, for example, to an unmatched driver's license or social security number. Nor is there any notice at all that if an application containing an error made by the applicant is not corrected <u>before</u> the book-closing date, the provisional ballot cast by the applicant pursuant to HAVA and Subsection 6 will not be counted.

Moreover, the "generic" notices may not, and often do not, reach applicants in the mail until it is too late to rectify any mistakes on their applications before the book-closing deadline. Even if an applicant timely presents herself at an election office with a passport or birth certificate in response to the notice that her application is "incomplete," her effort will have been to no avail. If she does not have her driver's license or social security card with her to match the name or number on her application, her application will remain "incomplete" and she will not be registered.[22] Having to go to an election office is burdensome enough for

---

[22] If applicants do not know what makes their applications "incomplete," they may go to the Supervisor of Elections' office without the proper documentation to verify their applications.

most individuals who may not have the means to get to an election office or cannot take the time from work to do so; an additional trip with the necessary documentation is even more so.[23]

Even the state's "Voter Registration" website, which is misleading, does not provide adequate notice. The website does not provide voters with <u>any</u> notice regarding Florida's matching scheme.[24] It does not once make mention of a matching program, nor does it state that if a voter registration application is "incomplete," a notice will be mailed to the applicant.[25] Furthermore, the website

Being permitted to fax or mail a copy of their documentation to verify their applications would not solve the problem. An applicant might send a photocopy of her driver's license when the real problem was matching her social security number. The Supervisor of Elections' office might not even try to match the newly provided driver's license number to the DHSMV database because that was not the initial problem. Even if it does try, if the driver's license was obtained prior to the applicant getting married and changing her name, or if her driver's license does not include a hyphen whereas the application does, it will still not match. If the applicant receives a second notice that is identical to the first, letting her know her application is "incomplete" or "incorrect," she will find herself in a vicious cycle of guessing as to what is wrong with her application. This of course assumes that election officials send out a second notice and that there is sufficient time to send out that second notice before the book-closing deadline.

[23] The state contends that voters can fax or e-mail copies of the required evidence instead of going to the Supervisor of Elections' office. Plaintiffs, on the other hand, argue that the notices do not contain a fax number or an e-mail address. Moreover, as noted above in footnote 21, faxing or mailing may not solve the problems arising from a "generic" notice that simply says an application is "incomplete."

[24] <u>See</u> Division of Elections, Florida Department of State, <u>Voter Registration: Voter Registration Application</u>, http://election.dos.state.fl.us/regtovote/regform.shtml (last visited Mar. 25, 2008).

[25] The website simply states what will happen if an application is complete: "If your application is complete and you are qualified as a voter, the Supervisor of Elections for your respective county of residence will send you a voter information card. This card will serve as official notification of your registration. If you do not receive your card within three weeks, or if

70

states that "[i]n order to register," an applicant must provide her driver's license number or the last four digits of her social security number, which will "be used only for voter registration purposes," and not as a determinant of an applicant's eligibility.[26] A state registration system, the specifics of which are not explicitly made known to potential voters, that leaves potential voters in the dark as to its effect on a voter's eligibility and that fails to give voters a fair opportunity to cure minor mistakes, is fundamentally unfair and violative of the Due Process Clause of the Fourteenth Amendment.

B.  Subsection 6 Violates the Equal Protection Clause of the Fourteenth Amendment.

Subsection 6 also violates the Equal Protection Clause of the Fourteenth Amendment.  When a state adopts an electoral system, the Equal Protection Clause of the Fourteenth Amendment guarantees qualified voters a substantive right to participate equally with other qualified voters in the electoral process.  Reynolds v. Sims, 377 U.S. 533, 566 (1964); see also Harper v. Va. Bd. of Elections, 383 U.S. 663, 665 (1966).  In any state-adopted electoral scheme, "[t]he right to vote is

---

you have any questions regarding your registration, please call your county Supervisor of Elections."  Id.

[26] Just above this language, the website lists the qualifications to become a registered voter in Florida, as enumerated under Florida Statutes § 97.041, a provision which does not mention the filing of a mistake-free application as a prerequisite to have an applicant's vote counted.  Id.

protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Bush v. Gore, 531 U.S. 98, 104–05 (2000); see also Davis v. Bandemer, 478 U.S. 109, 124 (1986) (noting that "everyone [has] the right to vote and to have his vote counted").

Having granted its citizens the right to vote, Florida must not only allow qualified voters to participate equally in elections, it must also ensure that qualified voters are given an equal opportunity to participate in elections. Holt Civic Club v. Tuscaloosa, 439 U.S. 60, 81 (1978) (Brennan, J., dissenting) (quoting Hadley v. Junior Coll. Dist., 397 U.S. 50, 56 (1970)). Despite this constitutional mandate, Florida's matching scheme results in the arbitrary and disparate treatment of its citizens based on their county of residence.

It is well-established that when a state accords arbitrary and disparate treatment to voters in different counties, which results in their votes being weighed differently, those voters are deprived of their constitutional rights to due process and equal protection. Bush, 531 U.S. at 107 (citing Gray v. Sanders, 372 U.S. 368, 379–80 (1963); Moore v. Ogilvie, 394 U.S. 814, 819 (1969)). Florida's registration scheme is "not a process with sufficient guarantees of equal treatment"

72

because it is completely devoid of specific standards to ensure that the right to vote is available equally to all potential voters.  See id. at 105–07 (finding that Florida's recount mechanisms to discern the "intent of the voter" were arbitrary as the state lacked specific standards to ensure their equal application).  From the lack of a procedure to discern whether the state or the applicant herself committed a matching error, to the differing notices and processes to correct unmatched applications, Florida's matching scheme is subject to disparate implementation among Florida's sixty-seven counties.  Even if Subsection 6 mandated uniform notice and methods for determining to whom a mistake is attributable, Florida's matching scheme would still result in uneven treatment of voters within counties.

Without the requisite post-"non-match" safeguards in place to ensure the non-arbitrary treatment of its voters, Florida's matching scheme stands as an unnecessary, additional barrier to registration, resulting in systemic errors as to applicants' eligibility and thereby creating unequal opportunities for Florida citizens to vote.  Indeed, this conclusion is reinforced by the fact that this error-prone system has resulted in a strong statistical likelihood that the registration process will be substantially more difficult for a minority voter than for a non-minority voter.[27]  Subsection 6's disproportionate impact on minorities cannot be

---

[27] See supra at note 4.

disregarded in assessing the scheme's constitutionality.

C. Subsection 6 Places an Undue Burden on the Right to Vote.

Florida's matching scheme likewise fails under the First and Fourteenth Amendments because it imposes a severe restriction on the right to vote that is not justified by a compelling state interest. See Burdick v. Takushi, 504 U.S. 428, 434 (1992). An individual's fundamental right to vote must be weighed against the state's power to regulate elections. See U.S. Const. art. I, § 4, cl. 1; see also Tashjian v. Republican Party, 479 U.S. 208, 217 (1986). We must assure that in balancing the two, we take into account both "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" and "the precise interests put forward by the State as justifications for the burden imposed by its rule." Burdick, 504 U.S. at 434 (quoting Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)).[28]

When an individual's First and Fourteenth Amendment rights are subject to "severe" restrictions, the state election law must be "narrowly drawn to advance a state interest of compelling importance." Id. at 434; Norman v. Reed, 502 U.S.

_____

[28] There is no bright line separating a permissible election-related regulation from an unconstitutional infringement on First Amendment freedoms. Timmons v. Twin Cities Area New Party, 520 U.S. 351, 359 (1997); see also Storer v. Brown, 415 U.S. 724, 730 (1974) (noting that there is "no litmus-paper test for separating those restrictions that are valid from those that are invidious" and that there "is no substitute for the hard judgments that must be made").

74

279, 289 (1992); see also Buckley v. Am. Constitutional Law Found., 525 U.S. 182, 216 (1999) (O'Connor, J., concurring in part, dissenting in part). In this case, we do not have a state electoral scheme that teeters on the cusp of reasonableness. Florida's matching scheme clearly imposes a "severe" restriction on 14,000 individuals—and counting—as it requires the matching of an identifying number as a prerequisite to voter eligibility. See Common Cause/Georgia v. Billups, 439 F. Supp. 2d 1294, 1350 (N.D. Ga. 2006) (noting that the deprivation of the right to vote is "undeniably demoralizing and extreme").[29]

Subsection 6 severely restricts the right to vote by adding a layer of complexity and precision to voter registration that is unduly burdensome. All unmatched voters are subjected to additional bureaucratic, administrative, and technological barriers to voting. Prior to the book-closing deadline, in order to cast a regular ballot on election day, unmatched voters must take steps to provide to the appropriate election official the necessary documentation to verify their application information. This entails traveling to an election office and navigating through a complex bureaucracy without clear guidance.

---

[29] See Crawford v. Marion County Election Bd., 484 F.3d 436, 438 (2007) (en banc) (Wood, J., dissenting) ("Recent national election history tells us . . . that disenfranchising even a tiny percentage of voters can be enough to swing election outcomes" [referring to, among other races, the gubernatorial race in Washington State in 2004, which was decided by only 129 votes] and "[e]ven if only a single citizen is deprived completely of her right to vote . . . this is still a 'severe' injury for that particular individual.").

For those who remain unmatched past the book-closing deadline, Subsection 6 places even more onerous burdens on the right to vote. For those voters whose applications were unmatched due to state error, and through no fault of their own, the applicants will now have to go to an election office within forty-eight hours of casting a provisional ballot. Within this short-window of time, the applicants will have to verify not only that the state made a mistake, but also confirm their application information to the satisfaction of an election official in their county. However, if the state determines that an applicant's own mistake led to the non-match, that applicant will never have a chance to cure her mistake after voting provisionally even if she presents indisputable documentary evidence of her eligibility. Subsection 6's burdensome requirements are all the more troubling because, as noted earlier, the state does not even have a uniform procedure in place to determine whether a mistake was made by the state or by the applicant herself.

To justify these burdensome requirements that have already disenfranchised over 14,000 Florida citizens, the state has advanced two interests: preventing voter fraud and maintaining the integrity of the electoral process. The state contends that Subsection 6 "secures to lawful voters the exclusive enjoyment of their political privileges" and that voter registration fraud "poison[s] the whole sphere of citizen participation in a representative democracy." (Appellant's Br. at 43.) While both

of these are compelling interests, Subsection 6 is <u>not</u> narrowly drawn such that its restrictions on the right to vote pass constitutional muster. In effect, Subsection 6 secures only to <u>some</u> lawful voters the exclusive enjoyment of their political privileges while denying that <u>very same</u> right to other lawful voters. And if voter registration fraud poisons the very fabric of our representative democracy, then Subsection 6 is just as poisonous in denying otherwise eligible voters a chance to have a voice in our democracy.

The state's argument that Subsection 6 is the "only reliable barrier" (Appellant's Br. at 40) in preventing certain voter fraud practices is completely unsupported. There is nothing "essential" about a registration system that deprives thousands of otherwise eligible voters of a fundamental right, and it is definitely not the only means of ensuring reliability in the integrity of elections. The state could simply require photo identification to achieve the same end.[30] Or, as in California, Florida could simply issue a unique identifying number to unmatched applicants and thus provide a reasonable safeguard for voters who are unmatched

---

[30] When there are less burdensome means to achieve a state's goal of preventing voter fraud, we should be very hesitant to uphold a registration system that decreases the number of registered voters and, as a result, chisels away at "the foundation of our representative form of Government." H.R. Rep. No. 85-291 (1957), <u>reprinted in</u> 1957 U.S.C.C.A.N. 1966, 1977. ("Th[e] right to vote . . . is . . . the foundation of our representative form of Government. It is the sole means by which the principle of consent of the governed as the source of governmental authority is made a living thing. Deprivation of the right to vote is the first step on the road to tyranny and dictatorship. . . . [T]he sovereign . . . must preserve this fundamental and basic right against any and all unlawful interference.").

but otherwise eligible to vote.  See Cal. Code Regs. tit. 2, § 20108.70(c) ("If a driver's license or state identification number cannot be identified or verified through [the matching database] and the registrant is otherwise eligible to vote, then a unique identification number shall be issued . . . ."); see also id. § 20108.38(c).  If the vast majority of other states do not have a matching scheme, how are they able to conduct legitimate and functional elections?[31]  By imposing an unduly severe restriction on Florida citizens' right to vote, the state has turned back the clock on the fundamental right to vote by disregarding the constitutional safeguards enacted to prohibit precisely the types of unlawful restraints embodied in Subsection 6.[32]

---

[31] Even within Florida, various groups are not subject to Subsection 6.  First, Florida's matching scheme does not apply to voters registered prior to the enactment of Subsection 6. Additionally, the matching requirement does not apply to those applicants who do not possess a driver's license or social security card.  Those applicants do not have to go through the matching process because the state provides them with a separate number.  They only have to affirm that they do not possess a driver's license or social security number.  See Fla. Stat. § 97.053(5)(a)(5). It makes little sense to devise a registration process that deprives an individual of the right to vote for truthfully providing her driver's license or social security number but whose number is not matched, while at the same time simply assigning a random number to another individual who does not have an identifying number and sparing her from the bureaucratic mishaps of Subsection 6.

[32] For all of the reasons discussed above, Plaintiffs have demonstrated a substantial likelihood of success on the merits.  Furthermore, Plaintiffs have also satisfied the other three factors necessary for a preliminary injunction, having demonstrated that the preliminary injunction is necessary to prevent irreparable injury, the threatened injury outweighs any harm the preliminary injunction would cause to the state, and the granting of the preliminary injunction will not have an adverse effect on the public interest.  See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1246–47 (11th Cir. 2002); Parker v. State Bd. of Pardons & Paroles 275 F.3d 1032, 1034–35 (11th Cir. 2001) (citing Zardui-Quintana v. Richard, 768 F.2d 1213, 1216 (11th Cir. 1985)).

V.  Conclusion

The right to vote is a "fundamental political right, because preservative of all rights." Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886).  Florida's matching requirement under Subsection 6, despite the state's contentions, is nothing more than a grave impediment to Florida citizens' fundamental right to vote.[33] Subsection 6 leaves a large number of otherwise eligible voters without a voice in our democracy, simply because of alphabetical and numerical mishaps.[34]  We must not forget that it was only just over fifty years ago that the Supreme Court held the

---

[33]  Subsection 6 further acts as an additional barrier in promoting higher voter turnout in the United States, where voter participation already lags "well behind" participation rates in other democratic countries.  League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 126 S. Ct. 2594, 2640 n.10 (2006) (citing Trevor Potter & Marianne H. Viray, Election Reform: Barriers to Participation, 36 U. Mich. J.L. Reform 547, 575–76 (2003)).  Average voter turnout for other democratic countries (in alphabetical order as of 2003):  Australia, 82.7%; Austria, 79.6%; Bahamas, 67.6%; Barbados, 66.7%; Belgium, 84.1%; Botswana, 44.6%; Canada, 60.1%; Colombia, 33.8%; Costa Rica, 81%; Denmark, 81.7%; Finland, 71.5%; France, 60.6%; Germany, 72.7%; Greece, 84.7%; Iceland, 88.3%; India, 60.1%; Ireland, 70.2%; Israel, 83.2%; Italy, 90.2%; Jamaica, 46.4%; Japan, 57%; Luxembourg, 60.5%; Malta, 96.7%; Mauritius, 79.8%; Netherlands, 75.2%; New Zealand, 80.4%; Norway, 75.7%; Papua New Guinea, 72.4%; Portugal, 78.4%; Spain, 79%; Sweden, 82.6%; Switzerland, 37.7%; Trinidad and Tobago, 68.8%; United Kingdom, 72.4%; and Venezuela, 49.9%. The average voter turnout for the United States is 44.9%.  See Potter & Viray, at 576 n.200.

[34]  Cf. Crawford v. Marion County Election Bd., 472 F.3d 949, 955 (7th Cir. 2007) (Evans, J., dissenting) ("The potential for mischief with this law is obvious.  Does the name on the ID 'conform' to the name on the voter registration list?  If the last name of a newly married woman is on the ID but her maiden name is on the registration list, does it conform?  If a name is misspelled on one—Schmit versus Schmitt—does it conform?  If a 'Terence' appears on one and a shortened 'Terry' on the other, does it conform?").  All of the scenarios laid out by Judge Evans would result in unmatched applications under Subsection 6.

polling tax to be unconstitutional as a qualification for voting,[35] and it was only just over thirty-five years ago that the Court upheld Congress' power to bar literacy tests.[36] Subsection 6, to the extent it acts as an unlawful impediment to voting that disproportionately affects minorities, must be viewed within this framework of past discriminatory practices with respect to voting.[37]

Florida's matching scheme is not an additional safeguard in ensuring the integrity of elections; rather, it is another in a long line of "discriminatory weapon[s]"[38] that have been used to disenfranchise otherwise eligible voters.[39] The state's goal of preventing voter fraud does not make a registration scheme that disproportionately deprives minorities of their right to vote any more legitimate. It is at times such as these that we are reminded of how fragile our rights can be,

---

[35] Harper v. Va. Bd. of Elections, 383 U.S. 663 (1966).

[36] Oregon v. Mitchell, 400 U.S. 112 (1970).

[37] Cf. Crawford, 484 F.3d at 438 (en banc) (Wood, J., dissenting) ("In this case, the plaintiffs assert that the state voter identification law is causing the wholesale disenfranchisement of some eligible voters. To the extent that it operates to turn them away from the polls, it is just as insidious as the poll taxes and literacy tests that were repudiated long ago.").

[38] Mitchell, 400 U.S. at 147 (Douglas, J., concurring in part, dissenting in part).

[39] See Crawford, 484 F.3d at 439 ("Finally, this court should not ignore this country's history. Unfortunately, voting regulations have been used in the not-so-distant past for discriminatory reasons. The law challenged in this case will harm an identifiable and often marginalized group of voters to some undetermined degree. This court should take significant care, including satisfactorily considering the motives behind such a law, before discounting such an injury.").

especially for certain groups which have historically been deprived of certain fundamental rights which our Constitution guarantees to every citizen, regardless of race or ethnicity. It cannot be that accidentally transposing two numbers on a voter registration application is a sufficient basis upon which to deprive an otherwise eligible voter a right which is "too precious, too fundamental"[40]—its fundamental nature stemming from "the equal dignity owed to each voter," Bush, 531 U.S. at 104, which is "at the heart of our democracy," Burson v. Freeman, 504 U.S. 191, 198 (1992).

---

[40] Harper, 383 U.S. at 670; see also 42 U.S.C. § 1973gg(a)(1)–(3) ("[T]he right of citizens of the United States to vote is a fundamental right," and "it is the duty of the Federal, State, and local governments to promote the exercise of that right" because "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." (emphases added)); Dunn v. Blumstein, 405 U.S. 330, 336 (1972) (noting that the right to vote is a "fundamental political right" (quoting Reynolds, 377 U.S. at 562)); Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979) ("[V]oting is of the most fundamental significance under our constitutional structure.").